Filed 9/18/18

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| FRANCIS A. BOTTINI, JR., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SAN DIEGO et al., <br><br> Defendants and Appellants. | D071670 <br><br><br> (Super. Ct. No. 37-2013-00075491-CU-WM-CTL) |

APPEALS from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.


Bottini & Bottini, Albert Y. Chang and Yury A. Kolesnikov for Plaintiffs and Appellants.

Office of the City Attorney, Mara W. Elliott, City Attorney, and Carmen A. Brock, Deputy City Attorney, for Defendants and Appellants.

Francis A. Bottini, Jr., Nina M. Bottini, and the Bernate Ticino Trust dated March 9, 2009, Trust 3 (the Bottinis) applied to the City of San Diego for a coastal development permit (CDP) to construct a single-family home on a vacant lot in La Jolla.  City staff

determined that the Bottinis' proposed construction project is categorically exempt from environmental review under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.),[1] but the City Council of San Diego (City Council; together with the City of San Diego, the City) reversed that determination. In reaching its decision, the City Council found that full environmental review is necessary because the Bottinis had removed a 19th century cottage from the lot on which they planned to build their residence shortly before they applied for a CDP. The City itself had previously voted against designating that cottage as a historical resource, declared that the cottage was a public nuisance, and authorized the Bottinis to demolish the cottage. Nevertheless, the City Council—*after* the cottage's demolition—declared the cottage "historic," concluded that the cottage's demolition must be considered part of the Bottinis' project for purposes of CEQA, and found that there was a reasonable possibility that CEQA's "historical resources" and "unusual circumstances" exceptions applied to the Bottinis' construction project, thus requiring full environmental review.

In response to the City Council's ruling, the Bottinis filed a petition for a writ of administrative mandamus seeking to compel the City Council to set aside its decision, as well as a complaint for damages against the City, based on alleged violations of the takings, due process, and equal protection clauses of the California Constitution. The City moved for summary judgment on the Bottinis' constitutional causes of action.

_____

[1]     All further statutory references are to the Public Resources Code, unless otherwise noted.

2

The court granted the Bottinis' petition for a writ of administrative mandamus and ordered the City Council to set aside its determination that the Bottinis' proposed construction project requires environmental review. Specifically, the court concluded that the demolition of the cottage is not a component of the Bottinis' construction project and, as a result, the City Council's determination that the project is not categorically exempt from CEQA review lacked substantial evidentiary support. The court also granted the City's motion for summary judgment on the Bottinis' constitutional claims.

We conclude that the trial court properly granted the Bottinis' petition for a writ of administrative mandamus because the demolition of the cottage that previously existed on the Bottinis' property is not a component of the Bottinis' residential construction project for purposes of CEQA. Rather, the cottage was demolished due to the City's determination that the cottage was a public nuisance in need of abatement—an event that occurred *before* the Bottinis applied for a CDP. We further conclude that the trial court properly granted the City's motion for summary judgment. Accordingly, we affirm the judgment in full.

I.

CEQA OVERVIEW

CEQA and its implementing regulations "embody California's strong public policy of protecting the environment." (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285.) " 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or

3

significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] [and] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' " (*Id*. at pp. 285-286.)

In furtherance of these goals, CEQA establishes a three-tier environmental review process. The first step is jurisdictional and requires a public agency to determine whether a proposed activity is a "project." Under CEQA, a project is defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . . [¶] . . . [¶] . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.) A project may encompass "several discretionary approvals by governmental agencies" and does not mean "each separate governmental approval." (Guidelines, § 15378, subd. (c).)[2] Thus, "CEQA's requirements [can]not [be] avoided by chopping a proposed activity into bite-sized pieces which, when taken individually, may have no significant adverse effect on the environment." (*POET, LLC v. State Air Resources Bd.* (2017) 12 Cal.App.5th 52, 73.) If a proposed activity is a project, the agency proceeds to the second step of the CEQA review process.

---

[2] All future references to Guidelines are to the Guidelines for Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.).

4

At the second step, the agency must "decide whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines [citations]." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*Bay Area Air*).) Examples of categorical exemptions include the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing structures (the Class 1 categorical exemption; Guidelines, § 15301); minor alterations in the condition of land, water, or vegetation (the Class 4 categorical exemption; *id.*, § 15304); and—of particular relevance to this appeal—the construction of a single-family residence (the Class 3 categorical exemption; *id.*, § 15303).

Unlike statutory exceptions, categorical exemptions are subject to exceptions. For instance, the Class 3 categorical exemption that is at issue in this appeal does not apply— or, stated differently, CEQA review *may* apply—if a project "may cause a substantial adverse change in the significance of a historical resource." (Guidelines, § 15300.2, subd. (f); Pub. Resources Code, § 21084, subd. (e).) For purposes of this decision, we will refer to this as the "historical resource" exception. The Class 3 categorical exemption also does not apply if "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) This exception is commonly referred to as the "unusual circumstances" exception.

If a project is categorically exempt and does not fall within an exception, " 'it is not subject to CEQA requirements and "may be implemented without any CEQA

compliance whatsoever." ' " (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 966.) But if a project is not exempt, the agency must then "decide whether the project may have a significant environmental effect." (*Bay Area Air, supra*, 62 Cal.4th at p. 382.) Under CEQA, a project that causes a substantial adverse change in the significance of an historical resource is considered to be a project that significantly impacts the environment. (§ 21084.1; see § 21060.5 [defining the environment as "the physical conditions which exist within the area which will be affected by a proposed project," including "objects of historic . . . significance."].)

Finally, if the project may have a significant effect on the environment, the agency must proceed to the third step of the process and prepare an environmental impact report (EIR). (§§ 21080, subd. (d), 21082.2, subd. (d), 21100, subd. (a), 21151, subd. (a).)

At each stage of the CEQA review process, the public agency must evaluate the environmental impact of a project against a measure commonly referred to as the baseline, i.e., the environment's state in the absence of the project. (*North County Advocates v. City of Carlsbad* (2015) 241 Cal.App.4th 94, 101 (*Carlsbad*); *CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 504 (*CREED-21*).) " '[T]he baseline "normally" consists of "the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced . . . ." ' " (*Carlsbad*, at p. 101; see *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 725 ["[T]he text of CEQA and the Guidelines identify *existing* conditions as the starting point (i.e., baseline) for determining and quantifying the proposed project's changes to the environment."].)

6

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Windemere and historical designation efforts*

The Windemere Cottage (Windemere) was a late Victorian-era beach bungalow in La Jolla designed by architects Joseph Falkenhan and Irving Gill. In 1927, the Windemere was moved from its original beachside location to Virginia Way. The Windemere exhibited features that were representative of early architecture in La Jolla, including a hipped roofline, eaves with exposed rafters, vertical board and batten redwood walls, and leaded, diamond-paned windows.

In 2010, the then-owner of the Windemere (the Prior Owner) nominated the Windemere for designation as a historical resource with the Historical Resources Board (the Board). The Board is the appointed body with authority over historical resources in San Diego, including the designation of historical sites, the establishment of historical districts, and the review of development projects that may affect historical resources. At the time, the Prior Owner intended "to restore the building to its 1894 Period of Significance." However, in February 2011—before the Board ruled on the Windemere's nomination—the Prior Owner sold the Windemere and the lot on which it was located to the Bottinis for $1.22 million. The Prior Owner also assigned the Bottinis her rights to the Windemere's historical designation application and a property report that Legacy 106, Inc. (Legacy 106) had prepared in support of the application.

After the sale, the Bottinis withdrew the pending nomination and submitted a single discipline preliminary review application to the Board to verify whether the

7

Windemere was eligible for historical designation—not to pursue historical designation, but rather, to "determine the constraints on future development" of the property. Together with the application, the Bottinis submitted the Legacy 106 report and an addendum that the Bottinis had solicited to rebut the report. Based on these submissions and an on-site visit, the Board's staff recommended that the Board deny historical designation. In the staff's view, the Windemere had undergone too many alterations to warrant historical designation.

In September 2011, the Board held a public hearing to determine whether to grant the Windemere historical status. More than a dozen speakers, including members of the Save Our Heritage Organization (SOHO) and the La Jolla Historical Society (LJHS), spoke in favor of historical designation. Nevertheless, a divided Board narrowly declined to grant historical status to the Windemere. SOHO and LJHS requested reconsideration of the decision, but the Board denied the organizations' request as untimely.

Shortly after the Board's vote, a preservation officer from the State Office of Historic Preservation (the State) notified the Board that the State had received photographs and context statements about the Windemere and, based on these submissions, believed that the Windemere "appear[ed] eligible" for the California Register of Historical Resources (Register).[3] The Register is "an authoritative guide in California to be used by state and local agencies, private groups, and citizens to identify

_____

[3]   The City requested judicial notice of the State's official website, but does not discuss the basis or purpose for its request. Accordingly, we deny the City's request.

8

the state's historical resources and to indicate what properties are to be protected, to the extent prudent and feasible, from substantial adverse change."  (§ 5024.1, subd. (a).)  The letter did not indicate that the State had received a nomination to list the Windemere in the Register, nor that it had acted on any such nomination.  Rather, it described the process by which properties *may be* nominated and stated that the State "encourages nominations of properties" to the Register.

B.      *The demolition of the Windemere*

In November 2011, the Bottinis requested that the City's Neighborhood Code Compliance Division (Code Compliance) determine whether the Windemere constituted a public nuisance.  Together with their request, the Bottinis included a report from a structural engineering firm, which stated that the Windemere was "uninhabitable and no persons [should] be allowed to occupy" it.  According to the report, the Windemere's roof, framing, and single wall construction were incapable of supporting gravity and seismic/wind loads, the rear porch was rotted, portions of the residence were decayed due to age and neglect, and the Windemere was susceptible to collapse in the event of a minor seismic event.

The San Diego Municipal Code sets forth the criteria by which a structure may be categorized as "unsafe, dangerous, or substandard" and therefore, deemed a public nuisance.  (Mun. Code, §§ 121.0402-121.0405.)  If a property is found to be a public nuisance, Code Compliance must issue a notice of abatement to the property owner describing, among other things, the basis of the determination and actions that must be undertaken to abate the public nuisance.  (*Id.*, § 121.0406.)  Failure to comply with an

9

abatement order is punishable as a misdemeanor. (*Id.*, §§ 12.0413, 121.0411.) The Municipal Code also establishes procedures that apply to abatement actions involving designated historical resources, which require a property owner to obtain a permit and ensure compliance with all applicable regulations and ordinances prior to the alteration, demolition, or relocation of the designated historical resource. (*Id.*, § 121.0419.)

After reviewing the Bottinis' request and conducting an on-site visit, Code Compliance sent the Bottinis a notice that declared the Windemere a public nuisance for six independent reasons, including the structure's dilapidated state, unfitness for habitation, and susceptibility to fire, earthquake, and wind. The notice further stated as follows: "In order to comply with City regulations, you are required to obtain a Demolition Permit . . . . [¶] In order to avoid abatement action, the Demolition Permit must be obtained and a Final Inspection Approval secured no later than **February 15, 2012**."[4] The next day, the Bottinis procured a demolition permit and promptly bulldozed

---

[4] The parties dispute whether Code Compliance ordered the Bottinis to obtain a demolition permit as the sole means by which to abate the public nuisance or whether the Bottinis, in the alternative, could have repaired the Windemere. Ultimately, we need not resolve this factual disagreement because it is undisputed that, at minimum, Code Compliance authorized the Bottinis to obtain a demolition permit and the City's Development Services Department (Department) issued the Bottinis a demolition permit.

10

the Windemere.[5]  Because Code Compliance declared that the Windemere was a public nuisance, the Bottinis did not have to obtain a CDP for the demolition.  (§ 30005, subd. (b); Mun. Code § 126.0704, subd. (f).)  Further, the abatement procedures for designated historical resources did not apply because neither the Board nor the State had designated the Windemere a historical resource at the time that Code Compliance rendered its public nuisance determination.

C.    *The CDP process and appeals*

In August 2012, the Bottinis—now the owners of a vacant lot—applied to the Department for a CDP to construct a single-family home on their lot.  As part of the permitting process, the La Jolla Community Planning Association (Planning Association) reviewed the proposed construction project.  During two public meetings, Planning Association members voiced concerns that the Bottinis may have engaged in improper project splitting under CEQA.  Nevertheless, the Department's environmental staff ultimately determined that the construction of the Bottinis' home was categorically exempt from CEQA review as new residential construction on a vacant lot.

The Planning Association and LJHS appealed the Department's decision to the City Council, claiming that the Department had failed to consider the "whole of the

---

5     The City requested judicial notice of a video showing the Windemere's demolition. We deny the request, as the City appears to be using the request as a guise to supplement the administrative record.  (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1190.)  The City also requested judicial notice of a video of the City Council meeting at which the demolition video was displayed.  We deny this request as unnecessary; the transcript for that meeting is already a part of the administrative record.

11

project" and alleging that the proper project baseline should have been set at a time *before* the Bottinis demolished the Windemere. Over the course of two meetings, the City Council heard testimony from supporters and opponents of the CEQA appeals. At the first meeting, Department staff and the deputy city attorney informed the City Council that the Bottinis had followed the Municipal Code "to the letter" in all the actions that they had undertaken. Still, the City Council deadlocked 4-4 on whether to grant the CEQA appeals. At the second meeting, one City Council member who had originally voted to deny the CEQA appeals switched his vote to grant the CEQA appeals "to get [the] item off [the City Council's] docket and to get the [Bottinis] out of [the] purgatory" of another tied vote.

As a result, the City Council issued a resolution granting the CEQA appeals and remanding the project to the Department to reevaluate its environmental determination with a baseline of January 2010□a date that preceded the Bottinis' purchase of the property. In its resolution, the City Council concluded that the Windemere's "demolition should be included in the environmental analysis" of the Bottinis' residential construction project. The City Council further concluded that the project was "not categorically exempt from environmental analysis" because two CEQA exceptions took precedence over the categorical exemption that governs the construction of single-family homes. Specifically, the City Council concluded that the redefined project (which now included the demolition of the Windemere), with its new baseline of January 2010 (when the Windemere still existed), would "have a significant effect on the environment due to unusual circumstances and may cause a substantial adverse change in the significance of

12

a historic resource" pursuant to section 15300.2, subdivisions (c) and (f) of the CEQA Guidelines.

D.    *The superior court action*

The Bottinis filed an action in the superior court, requesting issuance of a peremptory writ of mandamus directing the City to set aside its decision. In an amended petition, the Bottinis asserted causes of action against the City for inverse condemnation, equal protection, and due process violations. In their inverse condemnation cause of action, the Bottinis alleged that the City's CEQA determination constituted a regulatory taking of their property because it delayed their plans to construct a home on their property and, as a result, required them to pay a mortgage for both their existing home and an empty lot. In their due process and equal protection causes of action, the Bottinis contended that the City acted without any rational basis and intentionally targeted the Bottinis for disfavored treatment because they had demolished the Windemere.

After briefing and argument, the trial court granted the Bottinis' petition for a peremptory writ of mandamus. According to the court, the Bottinis' project is "a separate project distinct from the demolition of the [Windemere]." The court determined that the project baseline should be set at the point at which the property was "an empty lot" because the "[Windemere] had been razed pursuant to [the] demolition permit eight months before the Bottinis submitted their project application." On that basis, the court

13

found that the City had abused its discretion in concluding that the project is not categorically exempt from CEQA review.[6]

After further briefing and argument, the trial court granted summary judgment for the City on the Bottinis' constitutional causes of action. Applying the inverse condemnation standards that the California Supreme Court discussed in *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006 (*Landgate*), the court concluded that the City was entitled to summary judgment on the Bottinis' inverse condemnation cause of action because governmental review of a project "for compliance with CEQA is clearly a legitimate governmental purpose." The court further concluded that the City was entitled to summary judgment on the Bottinis' equal protection cause of action because no evidence demonstrated that the City had "intentionally discriminated" against the Bottinis or that the City lacked a rational basis for its decision. Finally, the court concluded that the City was entitled to summary judgment on the Bottinis' due process cause of action because the Bottinis have no protected property interest where, as here, the decision maker (the City) has discretion to grant or deny the benefit at issue (the CEQA categorical exemption).

---

[6] The City immediately appealed the trial court's order granting the Bottinis' petition for a peremptory writ of mandamus. In an unpublished decision, we dismissed the City's appeal for lack of jurisdiction. (*Bottini v. City of San Diego* (Jan. 26, 2016, No. D067510).)

14

The City appealed the judgment insofar as it granted the Bottinis' petition for a writ of mandamus and the Bottinis cross-appealed the judgment insofar as the trial court granted the City's summary judgment motion.

III.

ANALYSIS

A.  *CEQA*

1.  *Standard of review*

" ' "In considering a petition for a writ of mandate in a CEQA case, '[o]ur task on appeal is "the same as the trial court's." [Citation.]' . . . . Accordingly, we examine the [agency's] decision, not the trial court's [decision]." [Citation.]' [Citations.]" (*World Business Academy v. Cal. State Lands Com.* (2018) 24 Cal.App.5th 476, 491 (*World Business*).)

" '[O]ur inquiry extends only to whether there was a prejudicial abuse of discretion' by the agency. [Citation.] ' "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" [Citation.]' [Citation.] To the extent the question presented turns on an interpretation of CEQA, the Guidelines, or the scope of a particular exemption, it is one of law that we review de novo. [Citation.]" (*World Business, supra*, 24 Cal.App.5th at p. 492.)

2.  *Application*

This case turns largely on the propriety of the parties' dueling definitions of the project that is the subject of this dispute. The City, on the one hand, contends that the

15

City Council correctly defined the project to include the demolition of the Windemere and properly set a baseline of January 2010, before the Windemere was demolished. Framed as such, the City claims that the City Council accurately determined that the project would result in a substantial adverse change in the significance of an historical resource (the Windemere) and that the project is therefore not categorically exempt from CEQA review. The Bottinis, on the other hand, contend that the project should be defined to include only the construction of their residence and claim that the baseline should be set in August 2012, when they applied for a CDP. According to the Bottinis, the City Council erred by considering the Windemere's demolition as part of the project because the City itself had authorized the Bottinis to demolish the Windemere as a public nuisance, which they did several months before they submitted their CDP application.

Based on our review of the administrative record, we agree with the Bottinis and conclude that the City Council abused its discretion by determining that the project encompassed the demolition of the Windemere—an event that took place before the Bottinis filed their application to construct a residence. We also conclude that the City Council abused its discretion by setting a baseline in January 2010, a full year before the Bottinis acquired the property on which they planned to construct their residence. As we will discuss *post*, the City's issuance of a permit authorizing the demolition of the Windemere served a public safety objective untethered to the construction of the Bottinis' residence and, in any event, fell outside of the CEQA review process altogether because it was ministerial. Further, at the time the Bottinis filed their request for a CDP, the Bottinis' property was a vacant lot. Under CEQA, that environmental condition

16

accurately reflects the baseline for the Bottinis' construction project, not an environmental condition that presumes the continued existence of a cottage that, in reality, no longer existed at the time the Bottinis filed their application.

In short, the only project that remained for purposes of CEQA after the City's Code Compliance Division authorized the Bottinis to demolish the Windemere was the construction of a single-family residence on a vacant lot—a categorically exempt act under CEQA.

a.    *Applicable project definition and baseline*

As noted, the San Diego Municipal Code establishes procedures that Code Compliance must follow to identify unsafe, dangerous, or substandard structures, and to order their abatement "to protect and preserve the safety of the citizens and communities where these structures are located."  (Mun. Code, § 121.0401, subd. (a).)  These procedures require Code Compliance to determine whether a given structure is unsafe, dangerous, or substandard, according to a detailed set of criteria.  (*Id.*, §§ 121.0403-121.0405).  In this case, Code Compliance concluded that the Windemere constituted a public nuisance for six independent reasons under those criteria and, on that basis, authorized the Bottinis to obtain a ministerial permit to demolish the Windemere.

The City contends that we should treat the Windemere's demolition as part of the project under review because, in the City's view, the public nuisance determination that resulted in the issuance of a demolition permit was a "faux 'emergency' " that the Bottinis "cajoled," "pressur[ed]," and "coerc[ed] Code Compliance" into making.  We reject the City's characterizations of the public nuisance determination, for a number of reasons.

17

As an initial matter, this CEQA action is not the appropriate forum to launch a retroactive, collateral attack on the validity of Code Compliance's public nuisance determination. That public nuisance decision is final and is not the subject of this CEQA appeal. (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 647-649 [rejecting objector's attempt to use an appeal arising from the certification of an EIR as a vehicle to collaterally attack the validity of the City's general plan].)

Even if this were the appropriate forum to rehash the merits of the public nuisance determination, the City has directed us to no evidence—let alone substantial evidence—that calls into question Code Compliance's conclusion that the Windemere was a bona fide public nuisance. In fact, the City does not even attempt to articulate *why* it believes the public nuisance determination was incorrect. Instead, the City criticizes the Bottinis for removing various architectural features from the Windemere, which, in the City's words, "weaken[ed] its structural integrity." But the City does not accuse the Bottinis of violating any state laws or Municipal Code provisions by purportedly removing these architectural features. On the contrary, the City expressly concedes that the Bottinis were *not* required to obtain a building permit to engage in the conduct that the City alleges. Further, in arguing that the structural integrity of the Windemere was in fact "weaken[ed]," the City undercuts its own unsupported claim that the Windemere never should have been declared a public nuisance in the first place.

The City also has not directed us to any evidence to support its claim that the Bottinis "strong-armed" Code Compliance into making an unfounded public nuisance determination. On the contrary, when questioned at a City Council meeting, the deputy

18

city attorney *agreed* with the Department's assessment that the Bottinis had followed the Municipal Code "to the letter" by asking the Board to determine whether the Windemere was historical, notifying Code Compliance that the Board had concluded that the Windemere was not historical, and requesting that Code Compliance make a public nuisance determination. Under these circumstances, we conclude that there is no substantial evidence that undercuts Code Compliance's public nuisance determination or the legitimacy of the actions that the Bottinis undertook in connection with that determination.

We recognize, of course, that the public nuisance determination and the Windemere's subsequent demolition necessarily affected the conditions of the property on which the Bottinis later requested permission to construct their residence. However, the ministerial demolition permit furthered a goal unrelated to the construction of the Bottinis' residence—the protection and safety of the City's citizens. (Mun. Code, § 121.0401, subd. (a).) Indeed, the public nuisance determination itself states that Code Compliance visited and analyzed the property "to determine the condition of the structure with regards to fire, life, health and safety regulations of the City of San Diego." Further, the determination did not reference or authorize, let alone depend on, the subsequent issuance of a building permit to the Bottinis. (*Adams Point Pres. Soc'y v. City of Oakland* (1987) 192 Cal.App.3d 203, 207 [demolition was a separate project than the anticipated construction of a building on the demolition site because the demolition permit was not dependent on the issuance of a building permit].) Thus, the public nuisance determination confirms that the demolition permit served a purpose distinct

19

from, and was not a part of, the project under review. (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1226 [ordinances were separate projects because "[t]hey serve[d] different purposes"].)

Notwithstanding the public safety goals that the demolition permit advanced, the City contends that we still must treat the Windemere's demolition and the construction of the Bottinis' residence as a single cohesive project because the Bottinis purportedly knew *before* the demolition that they intended to construct a residence on the lot *after* the demolition. The City argues, for instance, that the construction of the Bottinis' residence was not a mere "afterthought," but rather, the Bottinis' goal when they purchased the property. According to the City, we would permit the Bottinis to violate the rule against segmentation of projects if we were to overlook the Bottinis' intent to construct a residence on the property. (Guidelines, § 15378, subd. (a) [project includes "the whole of an action"].)

Assuming that the Bottinis intended to construct a residence on the lot when they purchased it, that fact does not change the result of this case. That is because the demolition permit that Code Compliance authorized the Bottinis to obtain was, as all parties agree, ministerial. Whereas CEQA applies to certain nonexempt discretionary acts, it specifically excludes ministerial acts from its reach. (§ 21080, subd. (b) [excluding "[m]inisterial projects proposed to be carried out or approved by public agencies"].) This exclusion of ministerial acts "recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an EIR, or its functional equivalent, environmental review would be a meaningless exercise."

20

(*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117.) Because the demolition permit that Code Compliance authorized the Bottinis to obtain was ministerial, it fell outside of CEQA's scope altogether and the demolition that occurred as a result was not subject to environmental review, either then or now. (*Friends of Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 292-293 [rejecting argument that CEQA required consideration of both demolition permit and anticipated construction because both projects were ministerial].)

Our decision in *CREED-21* is particularly analogous to the case at hand. In *CREED-21*, the City of San Diego planned to replace storm drain pipes, construct storm drain infrastructure, and revegetate the affected area. (*CREED-21, supra*, 234 Cal.App.4th at p. 495.) The storm drain system failed before the City began its work, so the City constructed a new storm drain system under an emergency CEQA exemption. (*Ibid.*) After the emergency repair was complete, the City concluded that revegetation was the only act that required an environmental assessment, given that it was the sole component of the original project that had not been completed. (*Id.* at pp. 498-499.) In an appeal arising from a writ proceeding, we agreed. Specifically, we concluded that the work that the City had anticipated as part of its initially-defined project—the repair of the storm drain pipes and the construction of infrastructure—was "exempt from CEQA's environmental review provisions" due to the emergency permit, and "therefore no environmental review of that work was required under CEQA either before or after it was completed." (*Id.* at p. 506.)

21

The same is true here. The Bottinis very well may have purchased the Windemere and the lot on which it was located with the intention of constructing a new residence on that lot. Indeed, the Bottinis acknowledge that they filed a single discipline preliminary review application with the Board shortly after purchasing the property with the express purpose of "determin[ing] the constraints on future development" of the property. However, the City's own historical designation and nuisance abatement provisions enabled the Bottinis to obtain a ministerial permit to demolish the existing structure on their property and pave the way for future construction—provisions that the Bottinis followed "to the letter," according to the deputy city attorney. It is because of these Municipal Code provisions, as well as the City's sanctioning of the Bottinis' conduct at each step of the process, that an intervening CEQA-exempt event—the City's issuance of a ministerial demolition permit—occurred. As in *CREED-21*, this intervening event took place "outside of CEQA's requirements and therefore no environmental review of that completed work is required."[7] (*CREED-21, supra*, 234 Cal.App.4th at p. 506.)

Our conclusion that the project in this case consists solely of the construction of the Bottinis' residence comports with decisions from our court that have recognized that "CEQA generally applies *prospectively* to activities to be carried out in the future and *not*

---

[7] The City tries to distinguish this case from *CREED-21* on the basis that the intervening event in *CREED-21* was "a sudden, unexpected occurrence," whereas the nuisance determination here purportedly was not. But in *CREED-21* we did not base our holding on the "sudden" and "unexpected" nature of the intervening event. Rather, we based our decision on the fact that the intervening event was exempt from CEQA. So, too, is the ministerial permit at issue in this case. (§ 21080, subd. (b).) Accordingly, the City's attempt to distinguish *CREED-21* is unavailing.

22

*retrospectively* to work already completed."  (*CREED-21, supra*, 234 Cal.App.4th at pp. 502-503, italics added; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1452 (*Riverwatch*) ["We believe that in general preparation of an EIR is not the appropriate forum for determining the nature and consequences of prior conduct of a project applicant."].)  Indeed, the baseline for purposes of CEQA normally reflects the environmental conditions as they exist "at the time . . . environmental analysis is commenced" precisely because a baseline that reflects current conditions—rather than past conditions—enables a lead agency to more accurately assess a project's likely environmental impact before the project takes place.  (*Carlsbad, supra*, 241 Cal.App.4th at p. 101; see *CREED-21*, at pp. 506-507.)

California courts have applied this principle in a variety of circumstances, even when a project applicant's past conduct may have violated the law or escaped environmental review.  (*Riverwatch, supra*, 76 Cal.App.4th at pp. 1451-1453 [measure of a project's environmental impact should not include the applicant's past unauthorized activities in the region]; *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 561 [baseline "must include existing conditions, even when those conditions have never been reviewed and are unlawful"]; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1279-1280 [baseline for pilots' conditional use permit application was the year in which application was filed, even though the airport had expanded without CEQA review for decades]; *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1314-1316 [applying CEQA exemption to disposal facility's request for a waste permit, even though there was no record that the facility's prior activities had ever gone

23

through an environmental review].)  Insofar as the City Council in this case set a baseline in the past to measure the environmental impacts flowing from the Bottinis' prior conduct, these decisions demonstrate that the City's decision was legally erroneous.

Reasonable minds may differ as to whether the Board should have granted historical designation to the Windemere.  But the Board did not do so.  Reasonable minds may also differ as to whether the Bottinis should have attempted to repair the Windemere, rather than asking Code Compliance to declare it a public nuisance.  But they did not.  And Code Compliance did in fact authorize the Bottinis to obtain a ministerial demolition permit for the Windemere.  While the City may wish to turn back the clock and undo these decisions, that goal cannot be accomplished in this case by simply redefining the Bottinis' project and setting a CEQA baseline in the past, to a time when the Windemere still existed.  The fact is that the Bottinis' project for purposes of CEQA consists solely of the construction of a single-family residence and the proper baseline for that project is the physical environmental condition of the lot as it existed at the time the Bottinis filed their request for a CDP.  In concluding otherwise, the City Council abused its discretion.

> b. *Class 3 categorical exemption*

Because the City Council improperly defined the project and baseline, the City Council also erred in concluding that the project is not categorically exempt from environmental analysis under CEQA.  The CEQA Guidelines categorically exempt the construction of a single-family residence from review under CEQA.  (§ 15303, subd. (a); *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 727

24

(*Ukiah*) ["Guidelines section 15303 lists single-family residences as an example of a class 3 categorical exemption."].)  The project in this case consists of the construction of the Bottinis' proposed residence, with baseline conditions reflecting a vacant lot. Accordingly, the Class 3 categorical exemption squarely applies, subject to any applicable exceptions that might nullify the categorical exemption.

From our review of the administrative record, we discern no exception that would take precedence over the Class 3 categorical exemption.  In the proceedings before the City Council, the Council concluded that the historical resource exception applies.  That exception provides as follows:  "A categorical exemption shall not be used for a project which may cause a substantial adverse change in the significance of a historical resource."  (Guidelines, § 15300.2.)  However, with a properly defined project and baseline, substantial evidence does not support the City Council's conclusion.

Assuming that the Windemere did in fact constitute a historic resource under CEQA,[8] the Bottinis' construction project will not cause a substantial adverse *change* in the Windemere's significance. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist*. (2006) 139 Cal.App.4th 1356, 1392 [CEQA exception did not apply because "[a] *change* in physical conditions is a necessary predicate for a finding of environmental impact."], italics added.) Rather, as discussed *ante*, by the time the Bottinis applied for a CDP in August 2012, the Windemere had *already* been demolished pursuant to Code Compliance's December 2011 demolition authorization.

The City Council also concluded that the "unusual circumstances" exception applied. That exception precludes the application of a categorical exemption when a project will "have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) The "unusual circumstances" exception typically requires a showing that: (1) the project has some feature that distinguishes it from others

---

[8]    CEQA establishes three types of historical resources—(1) mandatory historical resources, which include resources listed in, or determined to be eligible for listing in, the Register; (2) presumptive historical resources, which include resources in a local register of historical resources or identified as significant in surveys of historical resources; and (3) discretionary historical resources, which include resources that lead agencies in their discretion consider to be historical, even if the resources have been denied listing or have not yet been listed on a local register. (*Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039, 1051-1062; § 21084.1; Guidelines, § 15064.5, subd. (a).) On appeal, the City contends—and the Bottinis dispute—that the Windemere constituted a discretionary historical resource. In light of our conclusion that the properly defined project, with a proper baseline, could not adversely affect the Windemere, it is unnecessary for us to resolve whether the Windemere was a discretionary historical resource.

26

in the exempt class, such as its size or location and (2) there is a reasonable possibility of a significant effect on the environment due to that unusual circumstance. [9] (*World Business, supra*, 24 Cal.App.5th at p. 498.)

Neither the City Council's resolution nor the City's appellate briefing has identified any distinguishing or unusual feature presented by the Bottinis' construction project.  The City points to the demolition of the Windemere as a distinguishing or unusual feature warranting application of the "unusual circumstances" exception.  However, for the reasons just discussed, the demolition of the Windemere is not part of the project at issue.  Accordingly, the Bottinis' project—the construction of a single-family home—has no features that distinguish it from others in the exempt class, and substantial evidence does not support the City Council's application of the "unusual circumstances" exception.  (*Ukiah, supra*, 2 Cal.App.4th at p. 736 [the "potential environmental impacts" were "normal and common considerations in the construction of a single-family residence" and did not constitute unusual circumstances].)

_____

[9]     The City takes contradictory and confusing positions in its appellate briefing regarding the City Council's reliance on the "unusual circumstances" exception.  In its opening brief, the City argues that the "City Council was justified in its conclusion [that the] Bottinis' self-serving actions present an 'unusual circumstances' [*sic*] barring the use of a categorical exemption."  But the City claims in its reply brief that the "City Council did not rely on the 'unusual circumstance' exemption to grant the appeals."  We have reviewed the administrative record and can confirm that the City Council did in fact conclude that the "unusual circumstances" exception applies to the Bottinis' project.

27

c.     *Conclusion*

For the foregoing reasons, we conclude that the "historical resources" and "unusual circumstances" exceptions do not apply to the Bottinis' residential construction project for purposes of CEQA.  Further, the City does not contend that any other CEQA exception applies.  Accordingly, CEQA's Class 3 categorical exemption applies to the Bottinis' residential construction project and the trial court's judgment is affirmed insofar as it granted the Bottinis' petition for a peremptory writ of mandamus.

B.     *The Bottinis' constitutional causes of action*

Based on the City's decision to grant the CEQA appeals and the residential construction delays resulting from that decision, the Bottinis also alleged three causes of action against the City for violations of the California Constitution's takings, equal protection, and due process clauses.  The trial court granted summary judgment in favor of the City on all three causes of action.  For the reasons discussed *post*, we agree that no triable issue of material fact exists as to the Bottinis' constitutional causes of action.  We therefore affirm the trial court's summary judgment ruling.

1.     *Standard of review*

Summary judgment may be granted only if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A defendant moving for summary judgment has the burden of presenting evidence that negates an element of plaintiff's claim or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to support an element of the claim.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th

28

446, 460; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).)

We review de novo the trial court's grant of summary judgment. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.) We take the facts from the record that was before the trial court when it ruled on the motion and consider all the evidence set forth in the moving and opposing papers, except those to which objections were made and sustained. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206; § 437c, subd. (c).) The court does not weigh the parties' evidence; rather, it must consider all the evidence and "all inferences reasonably deducible from the evidence." (§ 437c, subd. (c); *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 540-541; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.) However, "any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid*, at p. 535; *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874.)

2.     *Inverse condemnation*

a.     *Legal standard*

Both the United States and California Constitutions guarantee real property owners "just compensation" when their land is taken for a public use. (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.) These constitutional guarantees do "not prohibit the taking of private property, but instead place[] a condition on the exercise of that power." (*First English Evangelical Lutheran Church v. County of Los Angeles* (1987) 482 U.S. 304, 314.) Stated differently, the state and federal takings clauses are "designed not to

29

limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." (*Id.* at p. 315.)

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." (*Lingle v. Chevron U.S.A., Inc.* (2005) 544 U.S. 528, 537 (*Lingle*).) However, "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and . . . such 'regulatory takings' may be compensable" as a taking. (*Id.* at p. 537; *Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 415 ["[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."].)

"Two categories of regulatory action are generally 'deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. [Citation.] A second categorical rule applies to regulations that completely deprive an owner of " '*all* economically beneficial us[e]' " of her property. '[Citation.]" (*Dryden Oaks, LLC v. San Diego County Regional Airport Authority* (2017) 16 Cal.App.5th 383, 394-395.)

In addition to these "relatively narrow" categories of regulatory takings, the United States Supreme Court recognized a third "essentially ad hoc" category of regulatory takings in *Penn Cent. Transp. Co. v. New York City* (1978) 438 U.S. 104, 124 (*Penn Central*). (*Lingle, supra*, 544 U.S. at p. 538.) In *Penn Central*, the Supreme Court

30

identified three factors that are of "particular significance" for determining whether an ad hoc regulatory taking has occurred. The primary considerations are " 'the economic impact of the regulation on the claimant' " and the " 'extent to which the regulation has interfered with distinct investment-backed expectations.' " (*Lingle, supra*, 544 U.S. at pp. 538-539.) "In addition, the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred."[10] (*Id.* at p. 539.)

In this case, the trial court concluded that the City was entitled to judgment as a matter of law on the Bottinis' inverse condemnation cause of action, which alleged that the delay arising from the City Council's order granting the CEQA appeals violated the takings clause of the California Constitution. In granting summary judgment for the City, the court did not apply the *Penn Central* factors discussed *ante*. Instead, it applied the "substantially advances" standard that the California Supreme Court articulated in

---

[10]    A special regulatory takings test also applies to land-use exactions, i.e., demands that governments make on landowners to dedicate a portion of their property to the public as a condition for securing development permits. In land-use exaction cases, there must be an "essential nexus" between a "legitimate state interest" that the government asserts will be furthered by the condition of a development permit and the exaction, as well as "rough proportionality" between the development restriction and the impact that the state-imposed development condition is intended to mitigate. (*Dolan v. City of Tigard* (1994) 512 U.S. 374, 386, 391; *Nollan v. Cal. Coastal Com.* (1987) 483 U.S. 825, 837.) This standard does not apply because the Bottinis have not alleged a land-use exaction.

31

*Landgate, supra*, 17 Cal.4th 1006—a standard that asks whether the government's conduct substantially advances a legitimate state interest.

On appeal, the City urges us to apply the "substantially advances" formula in evaluating the trial court's summary judgment ruling. The Bottinis, on the other hand, contend that the "substantially advances" test is no longer good law and insist that we must apply the *Penn Central* test—a test that the Bottinis claim they have satisfied. Therefore, before we rule on the merits of the trial court's summary judgment ruling, we must resolve the proper legal standard that governs when a plaintiff alleges a regulatory taking under the California Constitution—a task that we turn to now.

In *Landgate*, the California Coastal Commission denied a landowner's request for a coastal development permit to build a residence on its property for several reasons, including the landowner's failure to obtain a necessary lot line adjustment from the Commission. (*Landgate, supra*, 17 Cal.4th at pp. 1011-1013.) The trial court granted the landowner's petition for writ of mandate compelling the Commission to set aside its decision on the basis that the Commission lacked jurisdiction to consider the lot line adjustment—that authority rested with the County of Los Angeles. (*Id*. at p. 1014.) The landowner also filed state and federal takings claims against the Commission, seeking damages for the delay caused by the Commission's erroneous determination that it, rather than the County, had jurisdiction over the setting of the property's lot lines. (*Id.* at p. 1013.) The trial court and the Court of Appeal found that the landowner was entitled to recover on its taking claims, but our Supreme Court reversed. (*Id.* at pp. 1015-1016, 1032.)

The Supreme Court cited *Penn Central* and its factors with approval, but did not in fact apply the *Penn Central* factors to the case before it. Instead, the Court—reciting language from a different United States Supreme Court case, *Agins v. City of Tiburon* (1980) 447 U.S. 255—found that a regulatory error alone does not amount to a taking if it is "part of a reasonable regulatory process designed to advance legitimate government interests . . . ." (*Landgate, supra*, 17 Cal.4th at p. 1021.) As the *Landgate* Court explained, "[t]he proper inquiry is . . . whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter." (*Id.* at p. 1022.) Under that means-end standard, the *Landgate* Court concluded that the Commission's permit denial, though erroneous, "appear[ed] to substantially advance legitimate governmental interests," and that it therefore did not give rise to a takings claim. (*Id.* at p. 1023.)

However, in *Lingle*, the United States Supreme Court subsequently held that the "substantially advances" formula that it had set forth in *Agins*—the formula that the California Supreme Court had cited in *Landgate*—was "regrettably imprecise" and is "not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." (*Lingle, supra*, 544 U.S. at p. 542.) As the unanimous *Lingle* Court explained, the aim of regulatory takings jurisprudence is to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." (*Id.* at p. 539.) To do so, courts must "focus[] directly upon the severity of the burden that government imposes upon private property rights." (*Ibid.*) However, "the 'substantially advances' inquiry

33

reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights.  Nor does it provide any information about how any regulatory burden is *distributed* among property owners.  In consequence, [the "substantially advances"] test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause."  (*Id.* at p. 542.)

The *Lingle* Court further found that the "substantially advances" test "asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose.  An inquiry of this nature has some logic in the context of a due process challenge, for a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause . . . .  But such a test is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." (*Lingle, supra*, 544 U.S. at p. 542.)  Thus, the *Lingle* Court held "that the 'substantially advances' formula is not a valid takings test, and indeed conclude[d] that it ha[d] no proper place in [the Supreme Court's] takings jurisprudence." (*Id.* at p. 548.)

In the wake of *Lingle*, state and federal courts alike have recognized that the "substantially advances" formula that the United States Supreme Court articulated in *Agins* and the California Supreme Court applied in *Landgate* no longer constitutes a valid test by which to determine whether there has been a regulatory taking under the Fifth Amendment; instead, the *Penn Central* factors govern.  (*Lockaway Storage v. County of*

34

*Alameda* (2013) 216 Cal.App.4th 161, 189 ["In light of *Lingle*, we reject the [c]ounty's contention that *Landgate* establishes an independent test for evaluating whether government action is a regulatory taking."]; *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1280 (*Allegretti*) ["Whether County's Action Substantially Advances a State Interest Is No Longer A Valid Standard to Assess An Unconstitutional Taking Under the Fifth Amendment"]; *Guggenheim v. City of Goleta* (9th Cir. 2010) 638 F.3d 1111, 1117 ["*Agins* was overruled by *Lingle*"]; *Crown Point Dev. Inc. v. City of Sun Valley* (9th Cir. 2007) 506 F.3d 851, 854 ["*Agins'* 'substantially advances' language—i.e., that it is a 'stand-alone regulatory takings test'—was rejected by the Supreme Court in *Lingle*."].)

To date, no published authority of which we are aware has expressly analyzed whether, in light of *Lingle*, the "substantially advances" formula remains a valid test by which to determine whether a regulatory taking has occurred under the takings clause of the *California* Constitution, as opposed to the Fifth Amendment to the United States Constitution. (*Allegretti, supra*, 138 Cal.App.4th at pp. 1281-1284 [declining to decide whether the "substantially advances" test is a viable regulatory takings test under the California Constitution].) We now answer that question in the negative and conclude that the *Penn Central* test endorsed in *Lingle*—and not the "substantially advances" formula—applies to ad hoc regulatory takings claims that arise under the California Constitution. We reach this conclusion for the following reasons.

First, the California Supreme Court has held that the takings clause in the California Constitution should be construed "congruently" with the federal takings

35

clause, with minor differences that are not applicable here.  (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664; see also, e.g., *Santa Monica Beach v. Superior Court* (1999) 19 Cal.4th 952, 957, 962-975 [takings challenge to rent control regulation under both clauses considered without separate discussion of the state clause].)  On that basis, at least one member of the California Supreme Court has explained that *Lingle's* ruling—i.e., its clarification that the "substantially advances" formula is a due process test—applies to challenges arising under the California Constitution.  (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 485 (conc. opn. of Werdegar, J.) ["Had *Lingle* already been decided, we would have considered it in our analysis."].)

Second, the rationale underpinning the *Lingle* decision applies with equal force to the California takings clause as to the federal takings clause.  "Indeed, it has long been recognized that the purpose of section 19 [of article I of the California Constitution], as well as the purpose of the takings clause of the Fifth Amendment to the United States Constitution, is to ensure that individual property owners are not compelled to bear burdens or incur costs that, in fairness and justice, should be borne by the public at large."  (*Williams v. Moulton Niguel Water Dist.* (2018) 22 Cal.App.5th 1198, 1210.)  But, as the *Lingle* Court described, the "substantially advances" formula neither elucidates the magnitude or character of the burden that the government regulation imposes upon private property rights nor provides information about how the regulatory burden is distributed among property owners.  (*Lingle, supra*, 544 U.S. at p. 542.)

36

Finally, no published California Supreme Court or Court of Appeal decision of which we are aware has applied the "substantially advances" formula to regulatory takings claims—whether based on the United States or California Constitution—since the United States Supreme Court issued *Lingle* thirteen years ago. On the contrary, it appears that California courts have implicitly *assumed* that the *Penn Central* formula—not the "substantially advances" test—applies to ad hoc regulatory takings claims under both the state and federal takings clauses. (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 651 [overturning trial court's ruling that plaintiff's state and federal takings claims were meritless because the trial court applied the "substantially advances" test, which is a "due process test"]; see *Besaro Mobile Home Park, LLC v. City of Fremont* (2012) 204 Cal.App.4th 345, 359 [applying *Penn Central* test to takings cause of action arising under California Constitution]; *Garcia v. Four Points Sheraton LAX* (2010) 188 Cal.App.4th 364, 389-390 [same]; *Small Property Owners of San Francisco v. City & County of S.F.* (2006) 141 Cal.App.4th 1388, 1402-1409 [same].)

Accordingly, and based on our Supreme Court's instruction that we are to interpret the California Constitution's takings clause congruently with the federal takings clause, we make explicit the conclusion that past decisions have impliedly reached and hold that the *Penn Central* test—not the "substantially advances" formula—applies to regulatory takings causes of action arising under the California Constitution.

b.      *Application*

In the following section, we apply the *Penn Central* standard to the facts of the present appeal. As noted, the *Penn Central* test requires us to examine three factors to

37

determine whether a regulatory taking has occurred: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with the claimant's reasonable, distinct investment-backed expectations; and (3) the character of the government action. (*Penn Central, supra*, 438 U.S. at p. 124.)

For the first factor, "we ask whether the regulation 'unreasonably impair[s] the value or use of [the] property' in view of the owners' general use of their property." (*Allegretti, supra*, 138 Cal.App.4th at p. 1278.) In this case, the evidence suggests that the City Council's decision had an adverse economic impact on the Bottinis. For example, the evidence shows that the Bottinis have had to pay a mortgage for both their existing home and an empty lot—at an additional cost of several thousand dollars per month—as a result of the construction delay caused by the City Council's erroneous resolution granting the CEQA appeals. Further, it is doubtful that the Bottinis could have made an alternative use of the property during the period in which they sought to overturn the City Council's decision, given that the lot is zoned exclusively for residential purposes. Thus, the economic impact factor weighs in favor of the Bottinis.

However, the second factor—the extent to which the City Council's decision interferes with a reasonable investment-backed expectation—weighs strongly against the Bottinis. "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.' " (*Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1005 (*Ruckelshaus*); see also *Allegretti, supra*, 138 Cal.App.4th at p. 1279.) Instead, it "must be objectively reasonable." (*Colony Cove Props., LLC v. City of Carson* (9th Cir. 2018) 888 F.3d 445, 452.) Additionally, "a reasonable expectation may [depend on]

38

whether the landowner had constructive knowledge of the regulation when choosing to [acquire] the property." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 273 (*Shaw*).)

The only evidence relevant to the second factor that the Bottinis have submitted is a three-page declaration from Francis Bottini, which states in pertinent part as follows: "When we purchased the home, the [Prior Owner] represented in the listing that the existing residence could either be renovated or demolished and replaced . . . . We relied on this representation in purchasing the property for $1.22 million because the existing residence appeared abandoned and not in good repair." This does not establish that the Bottinis had a distinct investment-backed expectation.

As an initial matter, Mr. Bottini's declaration does not state that, at the time the Bottinis purchased the property at issue, they *intended* to demolish the Windemere and construct a residence on the lot. Thus, the Bottinis' expectations are not distinct and concrete, but are instead vague and abstract. (*Allegretti, supra*, 138 Cal.App.4th at p. 1279 & *id.* fn. 9 ["[Plaintiff's] testimony was only that he had purchased the farm having been given 'lots of reassurances that it *could be* a viable farming operation' (italics added) and that his investment had not yet reached expectation . . . . [Plaintiff's] expectation is too general to meet the requisite *Penn Central* factor."]; *Shaw, supra*, 170 Cal.App.4th at p. 274 [affirming determination that there was no regulatory taking of property, where the property owners' "abstract and vague expectations [were] not the slightest bit 'distinct' so as to qualify as a ' "distinct investment backed expectation[]" ' that would favor the finding of a taking."].)

39

Even if the Bottinis had articulated that they had a distinct expectation to demolish the Windemere and build a residence at the time they purchased the property, there is no basis for us to conclude that the Bottinis had a reasonable expectation that they would be permitted to engage in such conduct *without undertaking any form of environmental review*. Indeed, Mr. Bottinis' declaration claims merely that the Prior Owner stated that the Windemere could "be renovated or demolished and replaced"—a representation that says nothing about whether environmental review would or would not be necessary.

Further, setting aside any representations that the Prior Owner may have made to the Bottinis, there is no evidence that *the City* informed the Bottinis before they purchased the property that they could demolish the Windemere and construct a residence without undergoing environmental review. This case thus stands in contrast to *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161 (*Lockaway*), on which the Bottinis rely. In that case, the County of Alameda informed a storage facility operator that it could build and operate a self-storage facility on a property that the operator had not yet acquired. (*Id.* at p. 168.) The operator then purchased the property and, after several years, the County reversed its stance. (*Id.* at p. 186.) On these facts, the court found that the operator had a reasonable investment-backed expectation. (*Id.* at pp. 185-186.) In this case, by contrast, there is no evidence suggesting that the Bottinis purchased the property in reliance on any representation *made by the City*.

In fact, at the time the Bottinis purchased the property, the Prior Owner's nomination for the Windemere's designation as a historical resource was still pending before the Board. Thus, when the Bottinis purchased the property, it was still possible

40

that the Board would grant historical designation to the Windemere—and indeed, it nearly did.  If that had happened, the Bottinis very likely would not have been able to demolish the Windemere and construct a new residence without satisfying the Municipal Code nuisance abatement procedures applicable to structures that have been designated as historical resources (Mun. Code, § 121.0419) and/or undergoing a full CEQA review (§§ 21060.5, 21084, subd. (e), 21084.1; Guidelines, § 15300.2, subd. (f)).  In addition, Mr. Bottini himself testified during one of the City Council hearings that he "knew when [they] bought [the] house . . . it would be well over a year before [they would] be able to do anything to that house" because of the historical review nomination that was pending at the time.  For all of these reasons, we conclude that the Bottinis lacked a reasonable and distinct investment-backed expectation.

Finally, the third *Penn Central* factor requires us to examine the "character" of the City's action.  (*Penn Central, supra*, 48 U.S. at p. 124.)  The *Lingle* Court explained that whether the government's conduct "amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred."  (*Lingle, supra*, 544 U.S. at p. 539.)  In this case, the City did not physically invade or appropriate the Bottinis' property.  Accordingly, this factor does not support a taking.  (*Shaw, supra*, 170 Cal.App.4th at p. 274 [holding that there was no regulatory taking, in part, because the government did not physically invade the property at issue]; *Allegretti, supra*, 138 Cal.App.4th at p. 1278 [same]; *Rancho De Calistoga v. City of Calistoga* (9th Cir. 2015) 800 F.3d 1083, 1091 [same].)

41

"We may dispose of a takings claim on the basis of one or two of [the *Penn Central*] factors." (*Allegretti, supra*, 138 Cal.App.4th at p. 1277.) For the foregoing reasons—in particular, the lack of a distinct investment-backed expectation—we conclude that the trial court did not err in granting summary judgment for the City on the Bottinis' inverse condemnation cause of action. (*Ruckelshaus, supra*, 467 U.S. at p. 1005 [disposing of takings claim relating to trade secrets solely on absence of reasonable investment-backed expectations].)

     3.     *Due process*

Under the California Constitution, a person may not be deprived of life, liberty, or property without due process of law. (Cal. Const., art. I, § 7, subd. (a).) "The concept of 'due process of law' guarantees both procedural and substantive rights." (*Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 93 (*Hayward*).) Although the Bottinis' complaint does not state whether they have asserted a procedural or substantive due process cause of action against the City, or both, their summary judgment briefing and appellate briefs focus on substantive due process concerns. Further, the Bottinis have not alleged or argued that the City denied them notice and an opportunity to be heard before depriving them of a protected

liberty or property interest—the foundational requirements of procedural due process.[11] (*Alviso v. Sonoma County Sheriff's Dept.* (2010) 186 Cal.App.4th 198, 209.) We therefore construe the Bottinis' cause of action as one sounding in substantive due process.

"Substantive due process protects against 'arbitrary legislative action, even though the person whom it is sought to deprive of his right to life, liberty or property is afforded the fairest of procedural safeguards.' [Citation.] To satisfy substantive due process concerns, 'the law must not be unreasonable, arbitrary or capricious but must have a real and substantial relation to the object sought to be attained. [Citations.]' " (*Hayward, supra*, 200 Cal.App.4th at p. 93.) " '[R]ejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process. [Citations.] Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation.' " (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 709.) Rather, "[a] substantive due process violation requires some form of outrageous or egregious conduct constituting a 'true abuse of power.' " (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 856 (*Las Lomas*).)

---

[11] The Bottinis briefly argue that one of the City Council members who voted to grant the CEQA appeals formerly served as an officer of LJHS and therefore, had "biased views" that detract from the "legitimacy" of the City Council's votes. However, the Bottinis relegated this undeveloped argument to a footnote. We therefore decline to consider it. (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 796, fn. 9.)

The Bottinis contend that a reasonable jury could conclude that the City Council's decision to grant the CEQA appeals and remand the Bottinis' CDP application to City staff for further environmental review was unreasonable, arbitrary, and capricious. The Bottinis further argue that a reasonable jury could find that the City Council acted as it did in order to punish the Bottinis for demolishing the Windemere.

We have no need to analyze whether a reasonable jury could reach these conclusions because, as the City correctly argues, the Bottinis have not identified any property interest or statutorily conferred benefit with which the City has interfered. (*Conejo Wellness Center, Inc. v. City of Agoura Hills* (2013) 214 Cal.App.4th 1534, 1562-1563 [affirming order dismissing due process claim brought under California Constitution because marijuana cooperative had no property right to operate dispensary]; *Chan v. Judicial Council of California* (2011) 199 Cal.App.4th 194, 201 [affirming order dismissing due process claim brought under California Constitution because plaintiffs had no property interest in remaining certified interpreters]; cf. *Schultz v. Regents of University of California* (1984) 160 Cal.App.3d 768, 783 ["If a [plaintiff] cannot show a statutory interest subject to deprivation, we believe the [plaintiff] must still identify a property interest in order to invoke due process rights under the state Constitution."].)

The Bottinis raised this argument both in the trial court and on appeal; however, the Bottinis have not attempted to identify any interest or benefit of which the City has deprived them. Instead, relying on *Galland v. City of Clovis* (2001) 24 Cal.4th 1003 (*Galland*), the Bottinis suggest that they need not identify any right or statutorily

44

conferred interest to prove a due process violation, as long as they can show that the City engaged in a "deliberate flouting of the law." (*Id.* at p. 1035.) The Bottinis are mistaken.

Under *Galland*, a government entity may be found liable for a due process violation for conduct that deliberately flouts the law, but such conduct still must "obstruct the [plaintiff's] constitutionally based *property rights*." (*Galland, supra*, 24 Cal.4th at p. 1040, italics added; *id.* at p. 1033 [the "deliberate flouting" test is the "appropriate substantive due process standard for determining when an administrative body charged with implementing a law acts erroneously *in such a way as to injure an individual's economic and property interests*."], italics added; *id.* at p. 1034 ["[A] deliberate flouting of the law *that trammels significant personal or property rights*" qualifies as a due process violation], italics altered; *id.* at p. 1040 ["[A]dministrative expenses can be charged directly to [the government] . . . only when the city imposes them in deliberate contravention of the law *to obstruct the [plaintiffs'] constitutionally based property rights* . . . ."], italics added.) Thus, the Bottinis can prevail only if they show that the City's allegedly deliberate flouting of the law interfered with a property right or statutorily conferred interest. They have identified no such right or interest.

Nor is it apparent that the Bottinis could identify such a right or interest. The Bottinis have no right or statutorily conferred interest that entitles them to bypass CEQA review. (*Las Lomas, supra*, 177 Cal.App.4th at pp. 848-852 [project applicant had no due process right to force lead agency to complete and consider EIR under CEQA]; *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288, 308 ["The procedural rights created by CEQA . . . do not operate as constitutional safeguards nor create fundamental, substantive

45

rights."].) Indeed, even if a lead agency declares a project categorically exempt under CEQA (for example, under a Class 3 categorical exemption), the agency has discretion to apply an exception that overrides the categorical exemption. Nor do the Bottinis have a property right or statutorily conferred interest in a discretionary CDP that has not yet been issued. (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 970-971 ["The Coastal Act sets only minimum standards and policies and creates no mandatory duty to issue development permits."].)

On these facts, we conclude that the trial court properly granted the City's motion for summary judgment on the Bottinis' substantive due process cause of action.[12]

4.      *Equal Protection*

The California Constitution, like its federal counterpart, guarantees the right to equal protection of the laws. (Cal. Const., art. I, § 7, subd. (a).) "Equal protection of the laws means that similarly situated persons shall be treated similarly unless there is a sufficiently good reason to treat them differently." (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326.)

---

[12]     We note that the Bottinis' prayer for relief requests only monetary damages for the due process cause of action, coupled with a general request for attorney fees and costs. However, "[i]t is beyond question that a plaintiff is not entitled to damages for a violation of the due process clause or the equal protection clause of the state Constitution." (*Javor v. Taggart* (2002) 98 Cal.App.4th 795, 807 (*Javor*).) Because we resolve this appeal based on the Bottinis' lack of a property interest or statutorily conferred benefit, we need not and do not address whether the Bottinis' inability to recover damages constitutes an independent basis on which to affirm the summary judgment order.

The Bottinis alleged a "class of one" violation, claiming that the City treated them differently from every other person seeking to build a single-family home insofar as the City required a full environmental review of a CEQA-exempt residential construction project. "To succeed on a class of one claim, a plaintiff must establish that '(1) the plaintiff was treated differently from other similarly situated persons, (2) the difference in treatment was intentional, and (3) there was no rational basis for the difference in treatment.' " (*Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1144.) The third element is essentially the same rational basis test that courts typically apply in equal protection cases involving economic regulations. (*Las Lomas, supra*, 177 Cal.App.4th at p. 858.) For purposes of this decision, we presume that the first two elements are satisfied and focus our attention on the third element.

Where the defendant is "the party moving for summary judgment[,] it has the burden of negating a necessary element of the plaintiff's case or establishing an affirmative defense. [Citation.] In the area of economic regulation, a legislative classification does not deny equal protection if the 'distinctions drawn by a challenged [act] bear some rational relationship to a conceivable legitimate state purpose.' [Citation.] Thus, in a case where the state moves for summary judgment, the state meets its burden by demonstrating some conceivably rational basis for its classification. 'A distinction . . . is not arbitrary if any set of facts reasonably can be conceived that would sustain it.' [Citation.] The state need not *prove* such facts exist; the existence of facts supporting the . . . [classification] is presumed. [Citations.] Once the state posits a rational basis for its classification, the burden shifts to the plaintiff to demonstrate the

47

classification bears no rational relationship to any conceivable legitimate state interest as a matter of law [citation] or to demonstrate there are triable issues of fact which, if resolved in favor of the plaintiff, would negate any rational basis for the classification." (*Wachs v. Curry* (1993) 13 Cal.App.4th 616, 622, revd. on other grounds *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974 (*Wachs*).)

In its motion for summary judgment and its appellate briefing, the City articulated just one basis for the City Council's conduct, i.e., that the City Council rationally could have granted the CEQA appeals and required the Bottinis' project to undergo environmental review because the City purportedly believed that "a potential statewide historic resource had been destroyed and the loss of a 100 year old beach cottage had evaded environmental review."

There can be no dispute that the state has a legitimate interest in protecting California's environmental resources and ensuring that statutorily mandated environmental reviews are conducted. (§ 21000 ["It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage . . . ."].) The Bottinis do not contend otherwise.

However, the parties dispute whether the City's decision was rationally related to achieving that interest. We conclude that it was. Although the Windemere no longer existed at the time the City Council issued its decision, thereby precluding any possibility that the Windemere could be preserved or relocated, the City could have reasonably

48

believed that an "environmental review" of the Bottinis' project would result in other forms of mitigation. (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 376, fn. 7, revd. on another point by Pub. Resources Code, § 21080.04, subd. (b) ["full environmental review" under CEQA includes "consideration of available measures to mitigate any environmental effects"].) In fact, before the City Council granted the CEQA appeals and ordered a CEQA review of the project, the Bottinis themselves proposed mitigation measures that did not involve the preservation or relocation of the Windemere, including the creation of a plaque commemorating the Windemere and the donation of the Windemere's architectural drawings to a historical society.[13]

Because the City satisfied its burden of articulating a rational basis for its decision, the burden shifted to the Bottinis to show that the City's decision bore no rational relationship to a conceivable legitimate state interest as a matter of law, or to demonstrate

---

[13] In relating the mitigation measures proposed by the Bottinis, we are not suggesting that these measures would constitute sufficient mitigation if a lead agency were to conclude that a project may cause a substantial adverse change in the significance of an historical resource. On the contrary, "preservation in place" is the preferred method of addressing environmental impacts affecting historical resources, unless the lead agency "determines that another form of mitigation is available and provides superior mitigation of the impacts." (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 87; see *League for Protection of Oakland's etc. & Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 909 [proposed measures to mitigate the demolition of an historical building, including a plaque and documentation of the building's historical features, did not "begin to alleviate the impacts of [the building's] destruction"].) Rather, we simply conclude that, under the deferential rational basis test, the City Council could have reasonably concluded that mitigation measures other than preservation or relocation of the Windemere would be sufficient here, where preservation and relocation were no longer viable options.

49

that there were triable issues of fact which, if resolved in favor of the Bottinis, would negate any rational basis for the classification. (*Wachs, supra*, Cal.App.4th at p. 622.) The Bottinis argue that they satisfied that burden for two reasons.

First, the Bottinis contend that a triable issue of fact exists because the City patently misapplied CEQA, namely, by requiring an environmental assessment of a CEQA-exempt project. As discussed *ante*, we agree that the City misconstrued CEQA and, on that basis, we have affirmed the trial court's order granting their petition for a peremptory writ of mandamus. However, we disagree that the City Council's mere misinterpretation of CEQA establishes a triable issue of fact as to whether the City Council violated the Bottinis' equal protection rights. The City Council articulated a rational basis for its decision, even though we have concluded that the expressed basis is erroneous. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1186 ["Plainly, the [c]ouncil erred in considering and deciding issues raised for the first time after the public hearing was over. Further, it *may have* misconstrued or misapplied the provisions of the zoning ordinance concerning lot coverage and usable open space. Nonetheless, the [c]ouncil's ultimate decision to deny the permits did not lack a rational basis."]; *Shaw, supra*, 170 Cal.App.4th at p. 278 ["[T]he [c]ounty's legal position, though later found to be erroneous, was nevertheless plausible" and therefore constitutional.].)

Second, the Bottinis argue that a reasonable jury could conclude that the City Council required an environmental assessment in order to punish the Bottinis for demolishing the Windemere. However, in making this argument, the Bottinis rely entirely on inference and have produced no *evidence* that the City Council ordered an

50

environmental review in order to punish them. The Bottinis contend that an intent to punish can be inferred from one City Council member's statement that an environmental assessment was needed to "do the right thing." We disagree. A City Council member's request that the City Council "do the right thing" in no way implies that the City Council member, let alone the entire City Council, sought to punish the Bottinis.

For all of these reasons, we conclude that the trial court did not err in granting summary judgment for the City on the Bottinis' equal protection cause of action.[14]

DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.


AARON, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.

_____

[14] As with their due process cause of action, the Bottinis seek only monetary damages, which cannot be recovered for alleged violations of the equal protection clause of the California Constitution. (*Javor, supra*, 98 Cal.App.4th at p. 807.) Our conclusion that the City had a rational basis for its decision obviates the need for us to determine whether the summary judgment ruling should be affirmed on this basis.