Filed 3/24/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CITIZENS FOR A RESPONSIBLE CALTRANS DECISION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DEPARTMENT OF TRANSPORTATION,<br><br>    Defendant and Respondent. | D074374<br><br><br>(Super. Ct. Nos. 37-2017-00041496-CU-MC-CTL, 37-2017-00041547-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge. (Retired Judge of the San Diego Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Reversed and remanded with directions.

Chatten-Brown, Carstens & Minteer; Jan Chatten-Brown and Joshua Chatten-Brown for Plaintiff and Appellant.

Jeanne Scherer, Chief Counsel, Jeffrey B. Benowitz, Deputy Chief Counsel and Glenn B. Mueller, Assistant Chief Counsel, for Defendant and Respondent.

In 2017, the California Department of Transportation (Caltrans) released a final environmental impact report (FEIR) for the construction of two freeway interchange ramps connecting Interstate 5 (I-5) and State Route 56 (SR 56) (the Project). The FEIR

stated: "After the [FEIR] is circulated, if Caltrans decides to approve the [P]roject, a Notice of Determination (NOD) will be published in compliance with CEQA by Caltrans, as well as[] by the California Coastal Commission (CCC), and Caltrans will publish a Record of Decision (ROD) in compliance with NEPA from Caltrans/FHWA." However, before the public comment period for the FEIR commenced and without issuing a notice of determination (NOD), Caltrans approved the Project a few days later and then filed a notice of exemption (NOE) two weeks later. The NOE stated that the Project was exempt from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) pursuant to Streets and Highways Code section 103,[1] which was enacted as of January 1, 2012. Citizens for a Responsible Caltrans Decision (CRCD) did not become aware of the NOE filing until after the 35-day statute of limitations period for challenging the NOE had run.

CRCD filed a petition for writ of mandate and declaratory relief alleging, inter alia, that Caltrans erroneously claimed the Project is exempt from CEQA under section 103 and that Caltrans is equitably estopped from relying on the 35-day statute of limitations for challenging notices of exemption. Caltrans demurred to the petition on the grounds that the causes of action were barred by the applicable statute of limitations and that the Project is exempt from CEQA under section 103. CRCD opposed the demurrer,

_____

1     All statutory references are to the Streets and Highways Code unless otherwise specified.

2

arguing that: (1) the petition alleged facts regarding Caltrans's statements and conduct showing that Caltrans is equitably estopped from relying on the 35-day statute of limitations; and (2) section 103's CEQA exemption did not apply to Caltrans's approval of the Project. The trial court sustained the demurrer without leave to amend and entered a judgment of dismissal.

On appeal, CRCD contends the trial court erred by sustaining Caltrans's demurrer to the petition because: (1) section 103 does not exempt Caltrans from complying with CEQA in its approval of the Project; and (2) the petition alleged facts showing equitable estoppel applies to preclude Caltrans from raising the 35-day statute of limitations. As explained *post*, we agree that the court erred by sustaining Caltrans's demurrer and therefore reverse the judgment of dismissal.

FACTUAL AND PROCEDURAL BACKGROUND

The North Coastal Corridor (NCC) project includes multiple proposed projects by Caltrans and the San Diego Association of Governments (SANDAG) to improve vehicle and railroad transportation in the 27-mile corridor from La Jolla to Oceanside. One of the NCC projects is the Project, which involves the construction of two freeway interchange ramps connecting I-5 and SR 56.

In 2005, a notice of preparation of an environmental impact report (EIR) for the Project was filed by Caltrans with the California Office of Planning and Research (OPR). Effective as of January 1, 2012, section 103 was enacted, providing for, inter alia, integrated regulatory review by the CCC of a public works plan (PWP) for the NCC projects, rather than a project-by-project approval approach. (§ 103, subd. (a)(4).)

3

In April 2012, Caltrans circulated a draft environmental impact report/environmental impact statement (DEIR) for public review and comment. The DEIR stated: "Caltrans is the lead agency under CEQA." The DEIR further stated:

> "Following receipt of comments from the public and reviewing agencies, an [FEIR] will be prepared. Caltrans may undertake additional environmental and/or engineering studies to address comments. The [FEIR] will include responses to comments received on the [DEIR] and will identify the preferred alternative. *Following circulation of the* [*FEIR*]*, if the decision is made to approve the [P]roject, a Notice of Determination [NOD] will be published for compliance with [CEQA]*, and a Record of Decision will be published for compliance with the National Environmental Policy Act [NEPA]." (Italics added.)

In October 2013, Caltrans issued an FEIR/environmental impact statement for its proposed NCC widening improvements to I-5 (i.e., construction of four express lanes), stating: "*CA SB 468* [*§ 103*] *is not intended to eliminate project-specific* [*CEQA*] *or* [*NEPA*] *reviews*; rather, it provides for integrated regulatory review by the [CCC]." (Italics added.) It noted that the I-5 NCC widening project and the Project (i.e., the I-5/SR 56 interchange project) "were . . . independently evaluated under CEQA and NEPA."

In June 2014, Caltrans and SANDAG issued the PWP for the NCC project.[2] In August 2014, the CCC approved the PWP. The PWP set forth "a blueprint for implementing a $6-billion 40-year program of rail, highway, transit, bicycle, pedestrian,

---

2  The PWP is entitled, "Final North Coastal Corridor Public Works Plan/Transportation and Resource Enhancement Program."

and coastal resource improvements that span 27 miles of the Northern San Diego County coastline from La Jolla to Oceanside. In particular, the PWP provided for improvements to I-5 through the addition of two express lanes in each direction. The PWP also discussed alternatives for improvements to the I-5/SR 56 interchange to provide better connectivity. The PWP stated:

> "Development activities requiring coastal development permits in the [CDP's] are regulated by the [CCC] and local governments through their respective [CDP] processes. Coastal Act Chapter 3 policy mandates and [CDP] requirements are implemented by local governments (cities and counties) pursuant to a certified LCP [local coastal plan]. Upon certification of an LCP by the [CCC], local governments assume [CDP] responsibility for most new development within their jurisdictions.

> "A PWP is an alternate vehicle for obtaining approval of large or phased public works projects and remains under the authority of the [CCC] irrespective of coastal permit jurisdictional boundaries. *A PWP is an alternative to project-by-project review for public works (which could require multiple [CDP's] for different components of a public works project).* A PWP must be sufficiently detailed regarding the size, kind, intensity, and location of development to allow the [CCC] to determine its consistency with the policies in Chapter 3 of the Coastal Act (pre-LCP certification) or the certified LCP (post-LCP certification). *Once the [CCC] approves a PWP, no [CDP] is required if the development is consistent with the PWP.* Instead, the permittee provides a Notice of Impending Development (NOID) to the [CCC] and other interested persons, organizations, and government agencies. The [CCC] then reviews the NOID for consistency with the approved PWP; if the [CCC] determines that the NOID is consistent with the PWP, the development may proceed. In these cases, however, the [CCC] may still apply conditions to that specific project to ensure consistency with the PWP." (Italics added.)

Importantly, the PWP added the following footnote to the above discussion of PWP's:

> "*The* [*CCC*] *PWP review and approval process is not intended to supplant the review processes required by* [*CEQA*], [*NEPA*] *or other regulatory schemes; compliance with the CEQA*, NEPA and/or other regulatory schemes *are addressed at the project level . . . .*"  (Italics added.)

Regarding the Project, the PWP stated:  "Given that a preferred alternative has not yet been selected for the [Project], this project may be subject to future PWP amendment and a NOID to ensure consistency with the approved PWP, or Caltrans may choose (in consultation with the [CCC] and the city) to submit a [CDP] application to the city. Project alternatives include improvements to local streets, adding auxiliary lanes along I-5 and SR 56, interchange improvements, or southbound-to-eastbound and westbound-to-northbound freeway connector ramps.  An environmental document [i.e., the DEIR] analyzing the alternatives was released in May 2012."

The PWP further provided that when Caltrans and SANDAG submit an NOID for a specific development project, they must attach a project report for that specific project. A project report must include, inter alia, "[*e*]*nvironmental documentation for the proposed development prepared pursuant to CEQA* and/or NEPA," as well as findings that "[*t*]*he proposed development has been reviewed in compliance with CEQA* and/or NEPA, and all conditions and/or mitigation measures identified in those CEQA and/or NEPA documents have been incorporated as part of the proposed development."  (Italics added.)

On June 26, 2017, Caltrans, as lead agency, released the FEIR for the Project.  The State Clearinghouse assigned to the FEIR the identifying number, "2005051061."  The

6

FEIR stated: "*After the* [*FEIR*] *is circulated, if Caltrans decides to approve the* [*P*]*roject, a Notice of Determination (NOD) will be published in compliance with CEQA by Caltrans*, as well as[] by the [CCC], and Caltrans will publish a Record of Decision (ROD) in compliance with NEPA from Caltrans/FHWA." (Italics added.) However, the FEIR also included the following (apparently inconsistent) language:

> "On January 1, 2012, . . . section 103 became effective.
> [Citation.] . . . [*S*]*ection 103, subdivision (d), together with Public Resources Code section 21080.5, mandate that instead of being analyzed under CEQA, the Interstate 5 North Coast Corridor and all of the projects included therein, shall be addressed under the* [*CCC's*] *review per its certified regulatory program.* [¶] . . .

> "Because the Project was identified as one of the series of projects analyzed and approved on August 13, 2014 by the [CCC] series of actions regarding the [PWP], *the Project's environmental review is to be considered in light of the approved* [*PWP*] *and the applicable Coastal Act policies*.

> "The CEQA process for the Project was initiated prior to the enactment of . . . section 103[.] [A]lthough *Public Resources Code section 21000 et*[] *seq., no longer applies to the environmental review of the Project*[,] Caltrans determined public disclosure of the analysis of the Project's anticipated impacts in the format of a Final EIR was still desirable. Therefore, the following document retains the joint EIR/EIS format presented to the public in the [DEIR]. *To the extent Public Resources Code section 21000 et seq. were applicable, this document would also satisfy the analytical and disclosure requirements associated with CEQA*.

> "This [FEIR] is not project approval for CEQA, NEPA, or Coastal Act purposes. *To the extent CEQA is applicable to this* [*P*]*roject, the signing of the Project Report and filing of the Notice of Determination* [*NOD*] *constitute the approval for CEQA purposes*."[3]
> (Italics added.)

---

3    The substance of this language was repeated in three other sections of the FEIR.

7

The FEIR further stated:  "Subject to the application of . . . section 103, as explained above, the [Project] is a joint project by [Caltrans] and the Federal Highway Administration (FHWA), and is subject to state and federal environmental review requirements.  Project documentation, therefore, was prepared in compliance with [NEPA], the California Coastal Act and, to the extent it is applicable, [CEQA].  Caltrans is the lead agency under NEPA.  Caltrans would be the lead agency under CEQA, if it were applicable. . . .  As is described in the Executive Summary above, although *Public Resources Code section 21000, et seq. is inapplicable*, because the analysis under CEQA is well developed and because it provides important analyses and public disclosures, Caltrans has decided to retain the joint CEQA/NEPA nomenclature for convenience of the reader.  The use of the Final EIR/EIS nomenclature is not intended to create legal duties or obligations which do not otherwise apply.  [¶]  . . .  [¶]  . . .  Following circulation of the [FEIR], if the decision is made to approve the [P]roject, a Record of Decision (ROD) would be published for compliance with NEPA from Caltrans/FHWA.  A Notice of Determination (NOD) would be published by the CCC for any affirmative action it would take in accordance to [sic] the [PWP] process.  Additionally, *to the extent CEQA applied, Caltrans would file an NOD* as well."  (Italics added.)  The FEIR also stated that Caltrans maintains a website for information on the Project (i.e., "http://www.keepsandiegomoving.com"), which it "frequently updat[es] . . . with accurate and timely information for all interested parties."

8

During the 30-day review period from July 14, 2017, through August 14, 2017, Caltrans received comments on the FEIR from, inter alia, municipalities, organizations, and the general public. Caltrans thereafter responded to the comments.

However, on or about June 30, 2017, Caltrans approved a project report for the Project. On July 12 (which date was *before* the 30-day review period for the FEIR commenced), Caltrans filed with the OPR a notice of exemption (NOE) for the Project, to which the State Clearinghouse assigned the identifying number "2017078159." The NOE stated: "The [P]roject is statutorily exempt from CEQA pursuant to . . . section 103 and Public Resources Code sections 21080.5, [subdivision] (c) and 21080.9. The [P]roject's impacts were analyzed consistent with the [CCC's] certified regulatory program. [Citation.]"

On September 28, 2017, CRCD's counsel first became aware of the NOE. Caltrans subsequently refused his request that it rescind the NOE or agree to a 180-day statute of limitations for challenging its approval of the Project.

On November 1, 2017, CRCD filed the instant petition for writ of mandate and declaratory relief, alleging, inter alia, that Caltrans improperly relied on section 103 in claiming an exemption from CEQA for the Project and should be estopped from relying on the 35-day statute of limitations under Public Resources Code section 21167,

9

subdivision (d).[4]  The petition also alleged that the FEIR failed to adequately analyze or disclose various environmental impacts of the Project.

Caltrans filed a demurrer to the petition.  On March 15, 2018, the court issued a minute order sustaining Caltrans's demurrer without leave to amend.  On April 4, 2018, the court entered a judgment dismissing the petition with prejudice.  CRCD timely filed a notice of appeal.

DISCUSSION

I

*Demurrer Standard of Review*

A "demurrer tests the pleading alone, and not the evidence or the facts alleged. Thus, a demurrer will be sustained only where the pleading is defective on its face." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459.)  On appeal from a judgment of dismissal based on an order sustaining a demurrer, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose."  (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)  We

---

4       On the same date, another organization, Citizens for Sensible Traffic Planning (CSTP), filed a separate petition for writ of mandamus and complaint for injunctive relief challenging Caltrans's approval of the Project.  The trial court subsequently consolidated the two cases.

may also consider matters that have been judicially noticed, but must disregard allegations that are contrary to law or facts judicially noticed. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591 (*Serrano*); *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).) Alternatively stated, "[w]e treat the demurrer as admitting all material facts properly pleaded but not contentions, deductions or conclusions of fact or law." (*Mitchell v. State Dept. of Public Health* (2016) 1 Cal.App.5th 1000, 1007 (*Mitchell*).)

Code of Civil Procedure section 430.30, subdivision (a) provides that when "any ground for objection to a complaint . . . appears on the face thereof, . . . the objection on that ground may be taken by a demurrer to the pleading." Therefore, a statute of limitations defense may be asserted by general demurrer if the complaint shows on its face that the statute bars the action. (*Mitchell*, *supra*, 1 Cal.App.5th at p. 1007; *Coalition for Clean Air v. City of Visalia* (2012) 209 Cal.App.4th 408, 419 (*Coalition for Clean Air*).) Nevertheless, " '[a] demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar . . . to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]' [Citation.]" (*Geneva Towers Ltd. Partnership v. City and County of San Francisco* (2003) 29 Cal.4th 769, 781 (*Geneva Towers Ltd. Partnership*).) Accordingly, it may be difficult for a "demurrer[] based on the statute of limitations to succeed because (1) trial and appellate courts treat the demurrer as admitting all material facts properly pleaded and (2) resolution of the statute of limitations issue can involve questions of fact. Furthermore, when the relevant facts are not clear such that the cause of action might be,

11

but is not necessarily, time-barred, the demurrer will be overruled." (*Coalition for Clean Air*, at p. 420.)

We review a court's denial of leave to amend on sustaining a demurrer for abuse of discretion. (*Traders Sports v. City of San Leandro* (2001) 93 Cal.App.4th 37, 43.) On appeal, the appellant must show there is a reasonable possibility the defect in the complaint can be cured by amendment. (*Ibid.*; *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842.)

II

*CEQA Generally*

"The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights Improvement Assn.*).) "CEQA and its implementing regulations 'embody California's strong public policy of protecting the environment.' [Citation.] ' "The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] [and] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant

12

environmental effects are involved." ' [Citation.]" (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 291 (*Bottini*).)

"CEQA establishes a three-tier environmental review process.  The first step is jurisdictional and requires a public agency to determine whether a proposed activity is a 'project.' . . .  If a proposed activity is a project, the agency proceeds to the second step of the CEQA process.  [¶]  At the second step, the agency must 'decide whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines [citations].' . . .  [¶]  Unlike statutory exemptions, categorical exemptions are subject to exceptions. . . .  [¶]  If a project is [statutorily or] categorically exempt and does not fall within an exception, ' "it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " ' [Citation.]" (*Bottini*, *supra*, 27 Cal.App.5th at pp. 291-292.) "[I]f a project is not exempt, the agency must then 'decide whether the project may have a significant environmental effect.' [Citation.]" (*Id*. at p. 292.)  "[I]f the project may have a significant effect on the environment, the agency must proceed to the third step of the process and prepare an [EIR].  [Citations.]" (*Ibid*.)

In general, statutory exemptions from compliance with CEQA are set forth in Public Resources Code section 21080, subdivision (b).[5]  If an agency determines that a

---

5    In addition, the Public Resources Code sets forth specific statutory exemptions for certain projects.  (See, e.g., Pub. Resources Code, §§ 21080.01 [California Man's Colony West Facility in San Luis Obispo County]; 21080.02 [new prison facility in Kings County]; 21080.03 [prison facilities in Kings and Amador Counties]; 21080.04 [Napa Valley wine train]; 21080.05 [lease or purchase of San Francisco Peninsula rail right-of-

13

project is exempt from CEQA, it may prepare a notice of exemption. (Cal. Code Regs., tit. 14, § 15061, subd. (d).6) After approving a project found to be exempt, the agency may file a notice of exemption with the OPR. (Pub. Resources Code, § 21108, subd. (b); Guidelines, § 15062, subd. (a).) If a notice of exemption is filed, the filing starts a 35-day statute of limitations "on legal challenges to the agency's decision that the project is exempt from CEQA. If a [n]otice of [e]xemption is not filed, a 180[-]day statute of limitations will apply." (Pub. Resources Code, § 21167, subd. (d); see also, Guidelines, § 15062, subd. (d).)

In general, on appeal a public agency's "determination that [a particular] project [is] exempt from compliance with CEQA requirements . . . is subject to judicial review under the abuse of discretion standard in Public Resources Code section 21168.5. [Citations.] Our inquiry focuses on 'whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citation.] [¶] Where the issue turns only on an interpretation of the language of the Guidelines or the scope of a particular CEQA exemption, this presents 'a question of law,

---

way]; 21080.07 [prison facilities in Riverside and Del Norte Counties]; 21080.42 [listing eight specific freeway and highway construction projects].)

6      The regulations implementing CEQA are set forth in California Code of Regulations, title 14, section 15000 et seq. and are hereafter referred to as the "Guidelines." (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1561, fn. 5.)

subject to de novo review by this court.'  [Citations.]"  (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 693 (*Save Our Carmel River*).)  "[Q]uestions of interpretation or application of the requirements of CEQA are matters of law."  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118.)  We review questions of law de novo.  (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 355.)

### III

### *Section 103*

CRCD contends the trial court erred by sustaining Caltrans's demurrer to the petition because, contrary to the court's finding, section 103 does not exempt Caltrans from complying with CEQA in its approval of the Project.

### A

"Well-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.  [Citation.]  We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent.  [Citation.]  The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.  [Citation.]  These canons generally preclude judicial construction that renders part of the statute 'meaningless or inoperative.'  [Citation.]"  (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715-716.)  "When statutory language is clear and unambiguous, ' "there is no need

15

for construction and courts should not indulge in it." ' [Citation.]" (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 (*Esberg*).) Another rule of statutory construction is "*expressio unius est exclusio alterius*, where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed." (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195 (*Wildlife Alive*).) However, that rule does not apply "where its operation would contradict a discernible and contrary legislative intent." (*Ibid.*; see also *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230 ["Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary."].) Statutory construction is a question of law that we decide de novo. (*Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 944.)

B

Except as CEQA otherwise provides, CEQA's provisions apply to all discretionary projects proposed to be carried out or approved by public agencies. (Pub. Resources Code, § 21080, subd. (a).) Although not within CEQA, section 103, enacted as of January 1, 2012, when construed together with Public Resources Code section 21080.5, provides an exemption from certain CEQA provisions for approval *by the CCC of the PWP*. Section 103 states in part:

> "(a) As used in this section, the following terms have the following meanings: [¶] . . .

16

"(2) 'North coast corridor project' means a 27-mile long series of projects within the coastal zone that includes improvements to a segment of [I-5] and the portion of the Los-Angeles-San Diego-San Luis Obispo rail corridor between the City of Oceanside and the City of San Diego in San Diego County. [¶] . . .

"(4) 'Public works plan' means a plan as described in Section 30605 of the Public Resources Code. A public works plan allows for an integrated regulatory review by the [CCC] rather than a project-by-project approval approach . . . . The public works plan allows for an expedited process that describes, evaluates, and provides mitigation measures for coastal access, highway, transit, multimodal and community enhancement, and environmental mitigation projects within the north coast corridor.

"(b) A public works plan approved for the north coast corridor project within the coastal zone shall include all of the elements of the north coast corridor project to be carried out by [Caltrans] or [SANDAG], including coastal access, highway, transit, multimodal, community enhancement, and environmental restoration, and mitigation projects. Once the public works plan for the north coast corridor has been approved and certified by the [CCC], subsequent review by the [CCC] of a notice of intent to develop for a specific project in the public works plan shall be limited to imposing conditions to ensure consistency of the project with the public works plan. The public works plan shall satisfy all of the following:

"(1) Identify the [CCC's] area of original jurisdiction and provide a process for obtaining coastal development permits [CDP's] from the [CCC] directly in those areas.

"(2) Contain, but not be limited to, the following elements: the type, size, intensity, and location of all development included in the north coast corridor project; . . .

"(3) Establish the mitigation measures that [Caltrans] and SANDAG will be required to undertake prior to construction of each phase. The mitigation measures shall be described with sufficient detail to allow [Caltrans] and SANDAG to accurately estimate the cost and effort associated with each particular measure and avoid the need for an amendment to the public works plan unless a project is inconsistent with the project description in the approved public works plan.

"(4)  Establish the process by which project design and mitigation measures included in the public works plan, and the [CCC's] findings regarding those measures, may be applied to subsequent coastal development permit [CDP] approvals and other approvals or determinations for subsequent phases of the project."

In addition, section 103 provides that for all elements of the NCC project that are located in the coastal zone, "SANDAG shall recommend that [Caltrans] select an alternative no larger than the 8+4 Buffer Alternative as the preferred alternative for the [I-5] north coast corridor . . . .  The determination of the preferred alternative shall be made by [Caltrans] and the Federal Highway Administration in their [EIR] or environmental impact statement [EIS] . . . ."  (§ 103, subd. (c)(3).)  Section 103, subdivision (c) further provides:

"(6)  Environmental consequences of the proposed north coast corridor project shall be monitored to ensure that the benefits from mitigation, as described in the permits issued for the individual projects, are being achieved.  [¶]  . . .

"(8)  Prior to a public works plan being submitted to the [CCC] by [Caltrans] and SANDAG, [Caltrans] and SANDAG shall provide at least two public hearings on the public works plan for the north coast corridor project."

Importantly for this case, section 103, subdivision (d) provides in part:

"The [CCC], [Caltrans], and SANDAG shall work cooperatively toward completing all design approvals, reviews, determinations, and permitting for the north coast corridor project on an expedited basis.  To meet the goals of this section, the following provisions shall apply:

"(1)  The Legislature finds that it is the [CCC's] role to apply a regional or statewide perspective to land use debates where the use in question is of greater than local significance.  To that end, the [CCC] is authorized to utilize Section 30515 of the Public Resources Code for the north coast corridor project and the process referenced

18

in that section may be streamlined pursuant to agreement between the California Coastal Commission [CCC] and those jurisdictions with an approved local coastal program [LCP].

"(2) [Caltrans] and SANDAG shall perform work and complete development consistent with the phasing program adopted in the public works plan pursuant to subdivision (b) unless changes are reviewed and approved by the [CCC].

"(3) *A public works plan prepared for the north coast corridor project by* [*Caltrans*] *and SANDAG shall be treated as a long-range development plan to which the provisions in Sections 21080.5 and 21080.9 of the Public Resources Code shall apply. . . .*"  (Italics added.)

Public Resources Code section 21080.09 defines a "long-range development plan" as "a physical development and land use plan to meet the academic and institutional objectives for a particular campus or medical center of public higher education."

Public Resources Code section 21080.5, as referenced in section 103, provides for certified regulatory programs that are exempt from certain CEQA provisions (e.g., preparation of an EIR), stating in part:

"(a) . . . [W]hen the regulatory program of a state agency requires a plan or other written documentation containing environmental information and complying with paragraph (3) of subdivision (d) to be submitted in support of an activity listed in subdivision (b), the plan or other written documentation may be submitted in lieu of the environmental impact report [EIR] required by [CEQA] if the Secretary of the Resources Agency has certified the regulatory program pursuant to this section.

"(b) This section applies only to regulatory programs or portions thereof that involve either of the following:  [¶]  (1) The issuance to a person of a lease, permit, license, certificate, or other entitlement for use.  [¶]  (2) The adoption or *approval of* standards, rules, regulations, or *plans* for use in the regulatory program.

19

"(c)  A regulatory program certified pursuant to this section is exempt from Chapter 3 (commencing with Section 21100), Chapter 4 (commencing with Section 21150), and Section 21167 [of the Public Resources Code] . . . ."  (Italics added.)

To qualify for certification, a regulatory program must, inter alia, have rules and regulations that:  "[r]equire that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment"; and "[i]nclude guidelines for the orderly evaluation of proposed activities and the preparation of the plan or other written documentation in a manner consistent with the environmental protection purposes of the regulatory program."  (Pub. Resources Code, § 21080.5, subds. (d)(2)(A), (B).)  The CCC's regulatory program for considering and granting CDP's and its regulatory program for the preparation, approval, and certification of LCP's have been certified by the Secretary of the Resources Agency. (Guidelines, § 15251, subds. (c), (f).)

Public Resources Code section 21080.9, also referenced in section 103, provides:

"[CEQA] shall not apply to activities and approvals by any local government . . . or any state university or college . . . , as necessary for the preparation and adoption of a local coastal program [LCP] or long-range land use development program [LRDP] . . . ; provided, however, that *certification of a* local coastal program [LCP] or *long-range land use development plan* [LRDP] *by the California Coastal Commission* [CCC] . . . *shall be subject to the requirements of* [*CEQA*].  For the purpose of Section 21080.5, a certified local coastal program [LCP] or long-range land use development plan [LRDP] constitutes a plan for use in the *California Coastal Commission's* [CCC's] regulatory program."  (Italics added.)

20

C

The parties do not cite, and we are unaware of, any cases construing section 103 or, in particular, its specific provision (i.e., § 103, subd. (d)(3)) treating the PWP as a long-range development plan (LRDP). Accordingly, we apply the rules of statutory construction to decide, as a matter of first impression, whether section 103, together with its references to Public Resources Code sections 21080.5 and 21080.9, provide *Caltrans* with an exemption from CEQA's requirement that an EIR be prepared and circulated before approving the *Project*. (Pub. Resources Code, § 21100 et seq.)

Our review of section 103, by itself, does not reveal any language expressly exempting Caltrans from CEQA's requirement that an EIR be prepared or circulated before approving the Project. Caltrans implicitly concedes that, but argues that Public Resources Code sections 21080.5 and 21080.9, which are referenced in section 103, provide such an exemption. We disagree. The plain language of section 103, together with its references to Public Resources Code sections 21080.5 and 21080.9, does not show any intent to exempt Caltrans from CEQA's requirement that an EIR be prepared and circulated before approving the Project. By providing that the PWP be treated as an LRDP to which Public Resources Code sections 21080.5 and 21080.9 apply, section 103, subdivision (d)(3), in effect, provides "that certification of [the PWP] . . . by the California Coastal Commission [CCC] . . . shall be subject to the requirements of [CEQA]." (Pub. Resources Code, § 21080.9.) Alternatively stated, when read together, section 103, subdivision (d)(3) and Public Resources Code section 21080.9 provide that the *CCC*, but not Caltrans, must comply with CEQA and, pursuant to Public Resources

21

Code section 21080.5, subdivision (d), prepare substitute environmental documentation when considering the certification and/or approval of the *PWP*. The CCC has a certified regulatory program for approval of LCP's, but *Caltrans* does *not* have any certified regulatory program. (Guidelines, § 15251.) Contrary to Caltrans's apparent assertion, there is no language in those statutes that expressly provides that Caltrans is exempted from CEQA's requirement that it prepare and circulate *an EIR for the Project* before approving the *Project*. Caltrans either mistakenly conflates the PWP with the Project *or* implicitly argues that the CCC's certification or approval of the PWP necessarily absolves Caltrans of any requirement to prepare and circulate an EIR for the Project. We are unpersuaded that those statutes exempt Caltrans from preparing and circulating an EIR for the Project.

The PWP includes a wide range of proposed projects for the NCC. Although one of the PWP's proposed projects were improvements to the I-5/SR 56 interchange, the PWP listed a number of alternatives and did not select or set forth any specific location or plan for any of those alternative improvements. Therefore, because the PWP did not include the Project, as defined in the FEIR, CCC's certification or approval of the PWP did not include the Project. More importantly, Public Resources Code sections 21080.5 and 21080.9, as referenced in section 103, address the *CCC's* regulatory program for LRDP's, and thus the *PWP*, and do *not*, expressly or implicitly address *Caltrans's*

22

obligation to prepare and circulate an EIR for the *Project* before approving the Project.[7]

If, as Caltrans argues, the Legislature had intended section 103 to exempt Caltrans from preparing and circulating an EIR for the Project, the Legislature presumably would have made that intent clear by expressly providing for such an exemption. By not expressly exempting from CEQA Caltrans's approval of the Project while doing so for the CCC's certification or approval of the PWP, we infer the Legislature did not intend to exempt Caltrans's approval of the Project. When the Legislature creates an express exemption from CEQA for a certain plan or project, we cannot infer it also intended to create other exemptions not expressly stated. (Cf. *Wildlife Alive*, *supra*, 18 Cal.3d at p. 195 ["where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed"]; *City of Coronado v. California Coastal Zone Conservation Com.* (1977) 69 Cal.App.3d 570, 580 ["[w]hen a statute expresses certain exceptions to a general rule, other exceptions are necessarily excluded"].)

---

7       To the extent Caltrans argues that it should be treated as a state university or college that is exempt from CEQA in adopting an LRDP under Public Resources Code section 21080.09, section 103 does not expressly provide for such treatment and, in any event, such treatment would only apply to Caltrans's adoption of the *PWP* and not its subsequent approval of the Project. Furthermore, if state universities and colleges are exempt from CEQA regarding proposed construction projects, we doubt there would be so many CEQA cases involving challenges to EIR's prepared by state universities and colleges for specific projects. (See, e.g., *City of San Diego v. Board of Trustees of California State University* (2015) 61 Cal.4th 945, 949; *City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 836; *Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025, 1028; *Laurel Heights Improvement Assn.*, *supra*, 47 Cal.3d at p. 387.)

23

Furthermore, had the Legislature intended to exempt the Project from CEQA's requirements, it presumably knew how to do so by expressly setting forth such an intent. For example, Public Resources Code section 21080.42 sets forth specific highway and freeway projects that are exempt from CEQA. (See, e.g., Pub. Resources Code, § 21080.42, subd. (a) [exempting from CEQA "(1) U.S. Highway 101 interchange modification, adding southbound auxiliary lane and southbound mixed flow lane, from Interstate 280 to Yerba Buena Road, in Santa Clara County"; and "(2) Construct north and southbound high-occupancy vehicle lanes on I-805 from I-5 to Carroll Canyon Road, including construction of north-facing direct access ramps in San Diego County."].) If the Legislature had intended to exempt the Project from CEQA, it could have easily expressed such an intent in a statute with language similar to that in Public Resources Code section 21080.42.

D

In support of its argument that section 103 exempts it from CEQA in approving the Project, Caltrans primarily cites three cases. However, all three cases involve the *CCC*'s approval of LCP's and not a lead agency's (e.g., Caltrans's) approval of a specific project under CEQA. *Fudge v. City of Laguna Beach* (2019) 32 Cal.App.5th 193 (*Fudge*), cited by Caltrans, involved a challenge to a CDP for a project that was issued by a city pursuant to its LCP. (*Id.* at pp. 196-198.) Neighbors appealed the city's issuance of the CDP to the CCC, which conducted a de novo review on the validity of the CDP based on whether it complied with the Coastal Act (Pub. Resources Code, § 30000 et seq.) and the city's LCP. (*Id.* at p. 198.) *Fudge*, citing Public Resources Code section 21080.5,

24

upheld the CCC's de novo review of the CDP and affirmed the trial court's dismissal of the neighbors' petition for writ of mandate.[8] (*Id*. at pp. 197-198.)

In *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900 (*Ross*), cited by Caltrans, the court held that Public Resources Code sections 21080.5 and 21080.9 exempted both the CCC and the city from preparing an EIR prior to approval of an amendment to the city's *LCP*. (*Ross*, at p. 940.) Instead of preparing an EIR, it was the CCC's burden under its Public Resources Code section 21080.5 certified regulatory program for approving LCP amendments to prepare the substitute environmental documentation required in Public Resources Code section 21080.5, subdivision (d).[9] (*Ross*, at pp. 930-931, 940.)

*Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864 (*Santa Barbara County Flower*), cited by Caltrans, also involved a proposed amendment to an LCP. (*Id*. at p. 868.) The county submitted to the CCC for its approval the proposed LCP amendment, along with an EIR for the proposed amendment. (*Ibid*.) After a petition for writ of mandate was filed challenging

---

[8]    In so doing, *Fudge* aptly noted the complexity of the law when an issue, as in this case, involves both CEQA and the Coastal Act, stating: "We venture once again into the brambled thicket of [CEQA]—an area of the law largely governed by the unfortunate fact that complicated problems often require complicated solutions. This case is rendered more recondite by the involvement of the [CCC's] rules and procedures, effectively overlaying the enigmatic with the abstruse." (*Fudge, supra*, 32 Cal.App.5th at p. 196.)

[9]    The CCC's regulatory program for approving LCP's was certified by the Secretary of the Resources Agency in 1979. (*Ross, supra*, 199 Cal.App.4th at p. 931.)

the EIR, the county realized that pursuant to Public Resources Code section 21080.5 it was exempt from preparing an EIR for the LCP amendment and asserted that exemption as a defense to the petition. (*Ibid.*) *Santa Barbara County Flower* affirmed the trial court's dismissal of the petition, concluding that the county could belatedly assert its Public Resources Code section 28010.5 exemption even though it had prepared an EIR for the LCP amendment. (*Id*. at pp. 869, 873.) Citing Public Resources Code sections 21080.5 and 21080.9, the court concluded that neither the CCC nor the county was required to prepare an EIR prior to approval of the LCP amendment. (*Id*. at p. 873.) In particular, the court concluded the county was not estopped from raising that exemption from preparing an EIR. (*Id*. at p. 876.)

Because the cases cited by Caltrans involve LCP's under the CCC's certified regulatory program and not approval of a project by a public agency pursuant to CEQA, they are factually inapposite to the instant case and do not persuade us that Caltrans is exempt from preparing and circulating an EIR for the Project. Rather, as discussed *ante*, Public Resources Code sections 21080.5 and 21080.9 provide the CCC with a substitute to EIR preparation when approving an LCP or LRDP (or amendments thereto). (See, Pub. Resources Code, § 21080.5, subd. (d).) Therefore, to the extent section 103 provides that the PWP be treated as an LRDP under those statutes, the *CCC* likewise is required to prepare only the substitute environmental documentation for the *PWP* as required in Public Resources Code section 21080.5, subdivision (d). Neither section 103, nor its referenced statutes, provide *Caltrans* with an exemption from CEQA's requirement that an EIR be prepared and circulated for the *Project*.

26

Furthermore, Caltrans does not cite any legislative history showing that section 103's plain language, as discussed *ante*, should instead be interpreted as providing Caltrans with an exemption from CEQA's requirement that an EIR be prepared and circulated for the Project. In any event, section 103's legislative history cannot change the plain meaning of section 103's language. (*In re Steele* (2004) 32 Cal.4th 682, 694 ["Although legislative history often can help interpret an ambiguous statute, it cannot change the plain meaning of clear language."].) Because the language of section 103, along with Public Resources Code sections 21080.5 and 21080.9, "is unambiguous, we need not consider various extrinsic aids, such as the purpose of the statute, the evils to be remedied, the legislative history, public policy, or the statutory scheme encompassing the statute." (*Esberg*, *supra*, 28 Cal.4th at p. 269.)

Finally, although Caltrans cites language in section 103 that the approvals, reviews, and permitting for the NCC projects in the PWP be completed "on an expedited basis" and that the CCC's approval process for the PWP "be streamlined," that language does not show an intent that Caltrans be exempted from CEQA's requirement to prepare and circulate an EIR before approving the Project. Contrary to Caltrans's assertion, that language shows only an intent that the *CCC's* approval process for the *PWP* be expedited and streamlined and does not express any intent that Caltrans be exempted from CEQA's requirements to prepare and circulate an EIR for the Project.

27

IV

*Equitable Estoppel*

CRCD contends the trial court also erred by sustaining Caltrans's demurrer to the petition because the petition alleged facts showing equitable estoppel applies to preclude Caltrans from raising the 35-day statute of limitations.

A

"The doctrine of equitable estoppel is based on the theory that a party who by his declarations or conduct misleads another to his prejudice should be estopped from obtaining the benefits of his misconduct.  [Citation.]  Under appropriate circumstances equitable estoppel will preclude a defendant from pleading the bar of the statute of limitations where the plaintiff was induced to refrain from bringing a timely action by the fraud, misrepresentation or deceptions of the defendant." (*Kleinecke v. Montecito Water Dist.* (1983) 147 Cal.App.3d 240, 245 (*Kleinecke*).)  "A defendant should not be permitted to lull his adversary into a false sense of security, cause the bar of the statute of limitations to occur and then plead in defense the delay occasioned by his own conduct." (*Ibid.*)  "Statutes of limitations are not so rigid that under certain circumstances principles of equity and justice will not allow them to be extended or tolled." (*Id.* at p. 247.)

"To establish estoppel as an element of a suit the elements of estoppel must be especially pleaded in the complaint with sufficient accuracy to disclose facts relied upon." (*Chalmers v. County of L.A.* (1985) 175 Cal.App.3d 461, 467.)  "In order to assert equitable estoppel, the following four elements must be present:  (1) the party to estopped must be apprised of the facts; (2) he must intend that his conduct be acted on, or must so

28

act that the party asserting estoppel had a right to believe it was so intended; (3) the party asserting estoppel must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Sofranek v. County of Merced* (2007) 146 Cal.App.4th 1238, 1250 (*Sofranek*).) "Whether equitable estoppel applies is normally a question of fact. [Citation.] However, where the complaint pleads undisputed facts establishing that equitable estoppel does not apply, the issue may be resolved on demurrer." (*Id.* at p. 1251.) Alternatively stated, when "the facts are undisputed, the existence of an estoppel is a question of law." (*Cal. Cigarette Concessions v. City of L.A.* (1960) 53 Cal.2d 865.)

A public agency may be equitably estopped in the same manner as a private party. (*Bertorelli v. City of Tulare* (1986) 180 Cal.App.3d 432, 440; *Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496 (*Long Beach*).) "[C]onduct on behalf of a public agency, which would induce a reasonably prudent person to avoid seeking legal advice or personally commencing litigation, may estop the public agency from asserting a claims defense . . . ." (*Bertorelli*, at p. 440.) "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite for such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Long Beach*, at pp. 496-497.)

B

As discussed *ante*, on appeal from a judgment of dismissal after a demurrer has been sustained, "[w]e treat the demurrer as admitting all material facts properly pleaded but not contentions, deductions or conclusions of fact or law." (*Mitchell*, *supra*, 1 Cal.App.5th at p. 1007.) We may also consider matters that have been judicially noticed, but must disregard allegations that are contrary to law or facts judicially noticed. (*Serrano*, *supra*, 5 Cal.3d at p. 591; *Blank*, *supra*, 39 Cal.3d at p. 318.)

Based on our independent review of CRCD's petition for writ of mandate and declaratory relief, we conclude it alleged sufficient facts, which we assume to be true for purposes of demurrer, showing that Caltrans is equitably estopped from relying on the 35-day statute of limitations for challenging notices of exemption. In particular, the petition's introduction alleged that Caltrans "assur[ed] the public in its [DEIR] and [FEIR] that Caltrans would file [an NOD] if the decision were made to approve the [P]roject." It alleged: "Caltrans provided no notice to either those who commented on the [DEIR] or to members of the general public that Caltrans intended to change course and filed a NOE instead of a NOD." It further alleged: "Interested parties relied upon Caltrans'[s] prior assurances that it would file a NOD if the Project were approved. Therefore, Caltrans is estopped from now asserting the statute of limitations has run following its unanticipated filing of a NOE."

The petition alleged, inter alia, the following facts:

> "15. The [DEIR] stated, "Following circulation of the [FEIR], *if the decision is made to approve the [P]roject, a [NOD] will be published for compliance with [CEQA]* . . . .

30

"16. Under the heading, 'Final Decision-Making Process,' the [DEIR] also stated, 'After the public circulation period, all comments would be considered, and Caltrans would select a preferred alternative and make the final determination of the proposed project's effect on the environment. *In accordance with CEQA, Caltrans would certify that the proposed project would comply with CEQA*, would prepare findings for all significant impacts identified, would prepare a Statement of Overriding Considerations for impacts that would not be mitigated below a level of significance, and would certify that the findings and Statement of Overriding Considerations were considered before project approval. *Caltrans then would file a [NOD] with the State Clearinghouse . . . .* [¶] . . .

"18. On June 26, 2017, Caltrans released the [FEIR]. The [FEIR] stated: *'After the [FEIR] is circulated, if Caltrans decides to approve the [P]roject, a [NOD] will be published in compliance with CEQA by Caltrans . . . .*

"19. The [FEIR] added that *the [FEIR] did not constitute project approval for CEQA, but that the signing of the Project Report and filing of the [NOD] would constitute the approval for CEQA purposes. . . .* [¶] . . .

"21. On July 12, 2017, unbeknownst to interested community members, including members of CRCD, OPR posted the NOE for the Project. [¶] . . .

"23. Counsel for CRCD first became aware that an NOE had been prepared for the Project on September 28, 2017, when Ms. Rachel Hooper . . . informed [CRCD's counsel] that Mr. Glenn Mueller, Caltrans'[s] counsel, told her that Caltrans issued a [NOE] on July 12, 2017. . . ." (Italics added.)

In its first cause of action, the petition alleged that the PWP stated: " '*The* [*CCC*]

*PWP review and approval process is not intended to supplant the review processes*

*required by* [*CEQA*], [NEPA] or other regulatory schemes; *compliance with the CEQA,*

NEPA and/or other regulatory schemes *are addressed at the project level*, such as . . . the

I-5 [EIR].' " (Italics added.) Importantly, the petition further alleged: "Caltrans

31

informed the public in its [DEIR] and [FEIR] that it would file a [NOD].  When Caltrans filed a NOE instead, Caltrans made no effort to inform the public of this significant change.  *As a result of Caltrans'[s] failure to inform the public and the public's detrimental reliance upon Caltrans'[s] repeated statements that it would file a NOD, Caltrans is estopped from arguing that the 35-day statute of limitations to challenge the Project has run*."  (Italics added.)  In support of the petition, CRCD attached exhibits, including excerpts from the DEIR and FEIR, which supported the petition's factual allegations.

In demurring to the petition, Caltrans argued that because on July 12, 2017, it filed, and the OPR posted, the NOE for the Project, the Public Resources Code section 21167, subdivision (d), 35-day statute of limitations barred the petition, which was not filed until November 1, 2017.  Caltrans also argued equitable estoppel did not apply to preclude its statute of limitations defense because the FEIR "repeatedly stated that Caltrans viewed [the] Project as CEQA exempt so [CRCD] had notice that Caltrans would file a NOE."  In support of that assertion, Caltrans attached excerpts from the FEIR.

In opposition to the demurrer, CRCD argued, inter alia, that Caltrans was equitably estopped from asserting the 35-day statute of limitations based on Caltrans's "statements and conduct that led [CRCD] to believe Caltrans would not approve the Project until August 15 at the earliest, and that, when Caltrans did approve the Project, it would issue an NOD, not an NOE."  CRCD argued:

32

"It is undisputed that Caltrans knowingly issued a Final Project Report approving the Project just four days after releasing an FEIR that informed the public that Project approval would occur only *after* the FEIR's circulation period.  It is also undisputed that Caltrans filed an NOE approximately two weeks later, despite repeatedly declaring it would publish an NOD."

In support of its assertion that Caltrans had represented it would approve the Project only after circulation of the FEIR, CRCD cited an excerpt from the FEIR, which stated: "After the [FEIR] is circulated, if Caltrans decides to approve the [P]roject, a [NOD] will be published in compliance with CEQA . . . ."  CRCD also argued that it was unaware that Caltrans had approved the Project and filed an NOE until September 28, 2017.  CRCD further argued that it reasonably relied on Caltrans's assurances that it would not approve the Project until after the FEIR had been circulated and would publish an NOD if Caltrans approved the Project.  CRCD argued it had been injured by its reliance on Caltrans's representations because it had delayed searching for approval documents until after the FEIR circulation period and then only searched for an NOD and not an NOE, thereby missing an opportunity to challenge the Project's approval.  CRCD argued that because it alleged sufficient facts showing Caltrans is equitably estopped from raising the 35-day statute of limitations defense, the demurrer should be denied.  In support of its

33

opposition, CRCD filed a request for judicial notice of certain documents, including all exhibits attached to the petition and certain excerpts from the PWP and FEIR.[10]

Our review of the petition's factual allegations, which we assume to be true, the documents attached to the petition, and those documents judicially noticed by the trial court, shows that there is, at a minimum, a disputed question of fact regarding whether the elements of equitable estoppel are satisfied; namely, whether: (1) Caltrans knew the true facts that it would not circulate the FEIR before approving the Project and would file an NOE, instead of an NOD, after such approval; (2) Caltrans made misleading statements of fact that it would circulate the FEIR before approving the Project and then file an NOD after such approval, which statements it intended to be acted on or that CRCD had a right to believe were intended to be acted on; (3) CRCD was ignorant of the true state of facts; and (4) CRCD relied upon Caltrans's conduct to its injury. (*Sofranek*, *supra*, 146 Cal.App.4th at p. 1250; *Kleinecke*, *supra*, 147 Cal.App.3d at pp. 245, 247.)

In particular, the documents submitted by CRCD support a reasonable inference that Caltrans knew the true facts that it would not circulate the FEIR before approving the Project and would file an NOE, instead of an NOD, after such approval, but nevertheless made misleading statements of fact that it would circulate the FEIR before approving the

_____

[10]     In sustaining only Caltrans's objections to other documents for which CRCD requested judicial notice, the trial court, in ruling on the demurrer, implicitly granted CRCD's request for judicial notice of the exhibits to the petition, the PWP, and the FEIR (as well as the 2013 FEIR for the NCC I-5 widening project).

34

Project and then file an NOD after such approval, which statements CRCD had a right to believe were intended to be acted on. *After* section 103's enactment as of January 1, 2012, Caltrans stated in its April 2012 DEIR: "Following circulation of the [FEIR], if the decision is made to approve the [P]roject, a [NOD] will be published for compliance with [CEQA] . . . ." In its 2013 FEIR for the NCC I-5 widening project, Caltrans stated that section 103 "is not intended to eliminate project-specific [CEQA] . . . review[]; rather, it provides for integrated regulatory review by the [CCC]." That 2013 FEIR also stated that the I-5 widening project and the Project were both "independently evaluated under CEQA . . . ."

In its 2014 PWP, Caltrans stated: "The [CCC] PWP review and approval process is not intended to supplant the review processes required by [CEQA] . . . or other regulatory schemes; compliance with the CEQA . . . [or] other regulatory schemes are addressed at the project level . . . ." The PWP also stated that when Caltrans submitted an NOID for a specific NCC project, it must attach a project report that includes "[e]nvironmental documentation for the proposed development prepared pursuant to CEQA" and findings that the "proposed development has been reviewed in compliance with CEQA."

Importantly, in its June 2017 FEIR for the Project, Caltrans continued to represent that it would approve the Project only after circulation of the FEIR and would then file an NOD in compliance with CEQA, stating: "After the [FEIR] is circulated, if Caltrans decides to approve the [P]roject, a [NOD] will be published in compliance with CEQA by Caltrans . . . ."

35

The undisputed statements made by Caltrans in the 2012 DEIR, the 2013 FEIR for the I-5 widening project, the 2014 PWP, and the 2017 FEIR, as quoted *ante*, support a reasonable inference that Caltrans made representations to CRCD and the public that it would approve the Project only after circulation of the FEIR and then would file an NOD with the OPR in compliance with CEQA's requirements. To the extent Caltrans cites contrary statements that it made in the 2017 FEIR, those statements do *not* preclude, as a matter of law, the reasonable inference that Caltrans made representations to CRCD and the public that it would approve the Project only after circulation of the FEIR and then would file an NOD in compliance with CEQA.[11]

It is undisputed that Caltrans issued its project report approving the Project on June 30, 2017, only a few days after issuing its FEIR for the Project and before the 30-day circulation period began for the FEIR. It is further undisputed that on July 12, again *before* the 30-day circulation period for the FEIR commenced, Caltrans filed with the OPR an NOE for the Project, claiming that the Project is statutorily exempt from CEQA pursuant to section 103 and Public Resources Code sections 21080.5, subdivision (c) and 21080.9. Despite its NOE's claim of exemption, Caltrans nevertheless thereafter

---

[11]    Those contrary statements are set forth on pages 7 and 8 of this opinion. For example, the 2017 FEIR stated that section 103 and Public Resources Code section 21080.5 "mandate that instead of being analyzed under CEQA, . . . all of the [NCC] projects . . . shall be addressed under the [CCC's] review per its certified regulatory program." It further stated: "Public Resources Code section 21000 et[] seq.[] no longer applies to the environmental review of the Project . . . ."

proceeded to circulate the FEIR for public comment from July 14, 2017, through August 14, 2017, received comments on the FEIR from municipalities, organizations, and the general public, and responded to those comments. Based on those facts, it can be reasonably inferred that Caltrans knew of its position that the Project was exempt from CEQA and would approve the Project and file an NOE, but nevertheless made misrepresentations to CRCD and the public, as described *ante*, that it would approve the Project only after circulation of the FEIR and then would file an NOD in compliance with CEQA. Therefore, the petition's factual allegations and the documents attached thereto and judicially noticed support a reasonable inference that the first two elements of equitable estoppel are satisfied. (*Sofranek*, *supra*, 146 Cal.App.4th at p. 1250; *Kleinecke*, *supra*, 147 Cal.App.3d at pp. 245, 247.)

We further conclude that CRCD alleged sufficient facts showing that: (1) CRCD was unaware of Caltrans's position that it was exempt from CEQA and would approve the Project and file an NOE, instead of an NOD, without first circulating the FEIR; and (2) CRCD reasonably relied on Caltrans's misrepresentations that it would circulate the FEIR before approving the Project and would then file an NOD in compliance with CEQA. In particular, the petition alleged that on July 12, 2017, "unbeknownst to . . . members of CRCD, OPR posted the NOE for the Project." The petition further alleged that prior to August 10, 2017, CRCD's counsel checked OPR's database for notices posted regarding the Project and did not find the NOE at that time and first became aware of the NOE on September 28, 2017. The petition further alleged: "When Caltrans filed a NOE instead [of an NOD], Caltrans made no effort to inform the public of this significant

37

change. As a result of Caltrans'[s] failure to inform the public and the public's detrimental reliance upon Caltrans'[s] repeated statements that it would file a NOD, Caltrans is estopped from arguing that the 35-day statute of limitations to challenge the Project has run." CRCD's allegations that it did not learn of Caltrans's approval of the Project and its filing of the NOE before the 35-day statute of limitations period had run support a reasonable inference that CRCD was unaware of Caltrans's position that it was exempt from CEQA and would approve the Project and file an NOE, instead of an NOD, without first circulating the FEIR and reasonably relied on Caltrans's misrepresentations that it would circulate the FEIR before approving the Project and would then file an NOD in compliance with CEQA. Alternatively stated, CRCD's allegations support a reasonable inference that it was ignorant of the true state of facts and relied on Caltrans's conduct to its injury. (*Sofranek*, *supra*, 146 Cal.App.4th at p. 1250.)

Because CRCD alleged sufficient facts in its petition and submitted supporting documents to support a finding that all of the elements of equitable estoppel were satisfied, Caltrans's demurrer to the petition on the ground that the 35-day statute of limitations barred CRCD's claims should have been overruled and the trial court erred by sustaining the demurrer. Assuming the truth of facts alleged in the petition and the conflicting statements made by Caltrans favorably to CRCD, we cannot conclude, as a matter of law, that CRCD has failed to state a cause of action against Caltrans for violation of CEQA. As stated *ante*, " '[a] demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar . . . to be raised by demurrer, the defect must clearly and affirmatively appear on the

face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]' [Citation.]" (*Geneva Towers Ltd. Partnership*, *supra*, 29 Cal.4th at p. 781.) Alternatively stated, "when the relevant facts are not clear such that the cause of action might be, but is not necessarily, time-barred, the demurrer will be overruled." (*Coalition for Clean Air*, *supra*, 209 Cal.App.4th at p. 420.) Here, we have such a case. Because we cannot, as a matter of law, determine that equitable estoppel does not apply to preclude Caltrans's assertion of the 35-day statute of limitations and we concluded *ante* that section 103 does not exempt Caltrans from preparing and circulating an EIR before approving the Project and from filing an NOD for the Project, Caltrans's demurrer should have been overruled and the trial court's order sustaining the demurrer must be reversed. In so concluding, we do not make any comment on the ultimate merits of the case.

To the extent Caltrans argues that CRCD did not allege CRCD would suffer an injustice from a failure to apply equitable estoppel sufficient to justify its effect on public interest or policy, we disagree. (*Long Beach*, *supra*, 3 Cal.3d at pp. 496-497.) It is implicit within the petition's allegations that the application of the 35-day statute of limitations would bar CRCD's causes of action and, in effect, allow Caltrans to proceed with the Project despite its alleged noncompliance with CEQA in approving the Project. Caltrans does not cite any public interest or policy that supports a position that a government agency should be allowed to make misrepresentations to the public regarding its intent to comply with CEQA in approving a project and then, in effect, secretly approve the project without compliance with CEQA and erroneously file an NOE for the

39

project.  Accordingly, in this case CRCD has alleged sufficient facts to survive Caltrans's demurrer.[12]

## DISPOSITION

The judgment is reversed; the matter is remanded for further proceedings with directions that the superior court vacate its order sustaining the demurrer and issue a new order overruling the demurrer.  CRCD is entitled to its costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.

---

[12]     Because we dispose of this appeal based on the inapplicability of section 103 and the potential application of equitable estoppel to preclude the application of the 35-day statute of limitations, we need not, and do not, address CRCD's additional contentions that the NOE was given an improper identification number by the State Clearinghouse and/or insufficiently posted by the OPR such that the 35-day statute of limitations was not triggered.